**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CALEB REESE** *et al.*, | ) | |
| | ) | **Civil Action No. 6:20-cv-01438** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUREAU OF ALCOHOL, TOBACCO,** | ) | |
| **FIREARMS AND EXPLOSIVES** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

STATUTORY BACKGROUND ........................................................................... 2

    I.    Statutory Provisions at Issue ................................................................. 2

    II.   Legislative History ................................................................................ 2

PROCEDURAL BACKGROUND ....................................................................... 5

ARGUMENT ...................................................................................................... 5

    I.    The Court Should Dismiss for Lack of Subject Matter Jurisdiction Because Plaintiffs Lack Article III Standing ..................................... 5

        A.    The Individual Plaintiffs Lack Standing to Sue ............................. 8

        B.    The Organizational Plaintiffs Lack Standing to Sue in Their Own Right, or on Behalf of Their Members ............................. 8

            1.    The Organizational Plaintiffs Lack Standing to Sue in Their Own Right ............................................................... 25

            2.    The Organizational Plaintiffs Lack Standing to Sue on Behalf of Their Members ..................................................... 10

    II.   The Court Should Dismiss for Failure to State a Claim on Which Relief Can Be Granted, or Enter Summary Judgment for Defendants ............................. 11

        A.    Plaintiffs' Claims Are Foreclosed by Binding Fifth Circuit Precedent ............................................................................. 11

        B.    In Any Event, None of Plaintiffs' Arguments Cast Doubt on the Soundness of the Fifth Circuit's *NRA* Decision or Bring This Case Outside Its Ambit ............................................................. 15

            1.    As *NRA* Recognized, Legislative Discretion Includes the Ability to Prescribe an Age Qualification Within a Historically-Established Range for the Exercise of Rights and Privileges That Collectively Constitute Adulthood ................... 15

            2.    The Fifth Circuit Also Rejected "Militia-Based Attack[s]" on the Age Qualification Because Militia Laws Do Not Suggest

That Individuals Under Twenty-One Have the Right to
Directly Purchase Handguns from Licensed Dealers ......................... 18

3.  *Heller* Expressly Allows for "Measures Regulating
Handguns," Including "Conditions and Qualifications" on
Their Commercial Sale ..................................................................... 24

CONCLUSION.............................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010)..........................................................................8, 10

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999)...............................................................................9

*Baz v. DHS,*
   No. 1:18-cv-01013 (CJN), 2019 WL 5102827 (D.D.C. Oct. 11, 2019)...................7

*Blassman v. Markworth*,
   359 F. Supp. 1 (N.D. Ill. 1973) .........................................................................17

*City of Hearne v. Johnson*,
   929 F.3d 298 (5th Cir. 2019)...............................................................................6

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...........................................................................................6

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)...................................................................................*passim*

*El Paso Cty. v. Trump,*
   982 F.3d 332 (5th Cir. 2020)............................................................................8, 9

*Ferguson v. Skrupa,*
   372 U.S. 726 (1963) .........................................................................................26

*Hassan v. United States,*
   441 F. App'x 10 (2d Cir. 2011)............................................................................7

*Horsley v. Trame,*
   808 F.3d 1126 (7th Cir. 2015)...........................................................................15

*Huddleston v. United States,*
   415 U.S. 814 (1974) ...........................................................................................3

*In re Gee,*
   941 F.3d 153 (5th Cir. 2019)...............................................................................5

*Johnson v. U.S. Off. of Pers. Mgmt.*,
   783 F.3d 655 (7th Cir. 2015)...............................................................................7

*Jones v. Jones*,
    72 F.2d 829 (D.C. Cir. 1934) ........................................................................ 16

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ........................................................................... 26

*La. ACORN Fair Hous. v. LeBlanc*,
    211 F.3d 298 (5th Cir. 2000) .......................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 6, 7, 11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................................... 18

*Miss. State Democratic Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) .......................................................................... 7

*Morrissey v. Perry*,
    137 U.S. 157 (1890) ..................................................................................... 16

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ................................................................. 8, 9, 10

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*,
    470 U.S. 451 (1985) ..................................................................................... 20

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ................................................................. *passim*

*Peruta v. Cty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ........................................................................ 26

*Sonnier v. Quarterman*,
    476 F.3d 349 (5th Cir. 2007) ........................................................................ 26

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ....................................................................................... 6

*Texas Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ........................................................................ 11

*United States v. Dukes*,
    479 F.2d 324 (5th Cir. 1973) ........................................................................ 16

*United States v. Emerson*,
   270 F.3d 203 (5th Cir. 2001) ........................................................................ 19

*United States v. Moore*,
   84 F.3d 1567 (9th Cir. 1996) .......................................................................... 8

*United States v. Olson*,
   473 F.2d 686 (8th Cir. 1973) ........................................................................ 16

*United States v. Rene E.*,
   583 F.3d 8 (1st Cir. 2009) ............................................................................. 24

*United States v. Zaleski*,
   489 F. App'x 474 (2d Cir. 2012) ................................................................... 22

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ........................................................................... 7

**Statutes**

10 U.S.C. § 246 ................................................................................................ 22

18 U.S.C. § 922(b)(1) ................................................................................ *passim*

18 U.S.C. § 922(c)(1) ................................................................................ *passim*

18 U.S.C. §§ 921-931 ........................................................................................ 2

Militia Act of 1792, 1 Stat. 271 (1792) ..................................................... 21, 22

Pub. L. No. 90-351, 82 Stat. 197 (1968) ...................................................... 3, 4

**Regulations**

27 C.F.R. § 478.99(b) ........................................................................................ 2

**Constitution**

U.S. Const. amend. XXVI, § 1 ........................................................................ 17

**Legislative Authorities**

2 Annals of Cong. 1805 (1790) ...................................................................... 22

S. Rep. No. 88-1340 (1964) ............................................................................. 3

S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112 ........... 4

v

S. Rep. No. 90-1501 (1968) .................................................................................. 3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. (1965) .......................................................... 3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. (1967) .................................................... 3, 4

*Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 88th Cong. (1963) .......................................................... 3

**Other Authorities**

42 Am. Jur. 2d Infants § 6 ................................................................................. 16

John McAuley Palmer, *America in Arms: The Experience of the United States with Military Organization* (1941) .......................................................................................... 22

Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323 (2011) .................................................................... 19

U.S. Dep't of Def., *DOD Directive 5210.56: Arming and the Use of Force* (Nov. 18, 2016), https://fas.org/irp/doddir/dod/d5210_56.pdf .......................................................... 23

## INTRODUCTION

After "conduct[ing] a multi-year investigation that revealed a causal relationship between the easy availability of firearms to young people under 21 and the rise in crime," Congress decided to further its compelling interest in combating such crime, and to supplement states' ability to control firearms sales to individuals below twenty-one.  *Nat'l Rifle Ass'n of Am. ("NRA") v. Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF")*, 700 F.3d 185, 207 (5th Cir. 2012).  However, Congress did not wish to prevent younger persons from owning or learning the proper usage of firearms.  Congress therefore "deliberately adopted a calibrated, compromise approach" by restricting the ability of federally-licensed firearms dealers to sell handguns directly to eighteen-to-twenty year olds, while allowing their parents or guardians to purchase such handguns as bona fide gifts for their children.  *Id*. at 209.  Congress acted appropriately in enacting this age qualification for the direct purchase of handguns, a law designed to preserve public safety, and to assist states with enforcement of their own minimum age qualifications for the purchase of handguns.

Two underage individual plaintiffs and three organizational plaintiffs have brought this action to challenge the constitutionality of the age qualification.  Their claims cannot proceed for three reasons.  First, Plaintiffs lack standing to sue because they have not formed any concrete plan to purchase or possess a handgun, and because they may not manufacture injury by foregoing a legal option for obtaining one (namely, receiving them as bona fide gifts from their parents following direct purchase from a licensed dealer).  Second, the Fifth Circuit in *NRA* has already rejected claims virtually identical to those plaintiffs assert here.  Third, none of plaintiffs' arguments cast doubt on the soundness of that decision or bring this case outside its ambit.  The Court should therefore dismiss Plaintiffs' claims or enter summary judgment for Defendants.

## STATUTORY BACKGROUND

### I.     Statutory Provisions at Issue

Plaintiffs challenge the constitutionality of two statutory provisions that impose

conditions on the commercial sale of firearms, to the extent they pertain to the purchase of

handguns and handgun ammunition.  Compl. ¶¶ 35-40.  Both provisions are part of the Gun

Control Act of 1968, as amended, 18 U.S.C. §§ 921-931 ("the Act").  The first statutory

provision, codified at 18 U.S.C. § 922(b)(1), makes it

> unlawful for any licensed importer, licensed manufacturer, licensed dealer, or
> licensed collector to sell or deliver . . . any firearm or ammunition to any individual
> who the licensee knows or has reasonable cause to believe is less than eighteen
> years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or
> ammunition for a shotgun or rifle, to any individual who the licensee knows or has
> reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1).  The second statutory provision, codified at 18 U.S.C. § 922(c)(1),

provides that in "any case not otherwise prohibited by [the Act], a licensed importer, licensed

manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at

the licensee's business premises (other than another licensed importer, manufacturer, or dealer)

only if" the purchaser submits a sworn statement attesting that he or she is not prohibited by 18

U.S.C., chapter 44, or applicable state or local law, from receiving firearms.  *Id*. § 922(c)(1).  If

the firearm to be purchased is a handgun, the purchaser must attest that he or she is twenty-one

years of age or older.  *Id*.[1]

### II.    Legislative History

"Congress passed the Omnibus Crime Control and Safe Streets Act of 1968 following a

multi-year inquiry into violent crime that included 'field investigation and public hearings.'"

---

[1] In addition to challenging these two statutory provisions, Plaintiffs also challenge 27 C.F.R. § 478.99(b), which is s
phrased identically to 18 U.S.C. § 922(b)(1).  *See* Compl. ¶ 39.

*NRA*, 700 F.3d at 198 (quoting S. Rep. No. 88-1340, at 1 (1964)).  During the hearings, many witnesses presented testimony regarding the problem of individuals evading state requirements for firearms purchases—including underage individuals evading state minimum-age requirements – by traveling across state lines, and then using their firearms in criminal activities.[2]  As a result of these hearings, Congress found "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power."  *Id*. (quoting Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225 (1968)).  Congress further determined that

> the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

*Id*. at 198-99 (quoting Pub. L. No. 90-351, § 901(a)(2), 82 Stat. at 225); *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) (purpose of the 1968 Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of *age*, criminal background, or incompetency") (quoting S. Rep. No. 90-1501, at 22 (1968)) (emphasis added).

---

[2] *See Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 88th Cong. 3437-38, 3375-76 (1963) (statements of James V. Bennett, Dir., U.S. Bureau of Prisons; Lawrence W. Pierce, N.Y. Police Dep't); *id.* at 3405, 3425-26 (statement of John W. Coggins, Chief, Technical Branch, Alcohol and Tobacco Tax Div., U.S. Dep't of the Treasury), https://plus.lexis.com/document/ index?crid=7923d206-1445-47b0-a689-81ac43e70e59&pdpermalink=bb92be17-12ad-4166-992d-fe62bc779d15&pdmfid=1530671&pdisurlapi=true; *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 3-5, 450, 473 (1965) (statements of Sen. Dodd; Howard R. Leary, Comm'r, Phila. Police Dep't; Sen. Dodd, quoting telegram from Charles A. O'Brien, Chief Deputy Att'y Gen., Cal.), https://plus.lexis.com/document/index?crid=09639046-0833-4559-a12e-94f6163b9ba3&pdpermalink=32cb3a01-1fa9-4a2a-9565-52d23d90aeda&pdmfid=1530671&pdisurlapi=true; *Federal Firearms Act: Hearings Before the Subcomm. To Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 368, 595 (1967) ("1967 Hearings") (statements of William L. Cahalan, prosecuting attorney, Wayne Cty., Mich.; Benjamin C. Stanczyk, Judge, Common Pleas Court, Detroit, Mich.), https://plus.lexis.com/ document/ index?crid=4b4f0217-b133-4b2c-bd76-1da0efbd713a&pdpermalink=d1a6af60-dc4f-451e-a313-97c07bd50e1e&pdmfid=1530671&pdisurlapi=true.

Additionally, in a section titled "Acquisition of firearms by juveniles and minors,"[3] the

Senate Report accompanying the Act provides:

> [T]he title would provide a uniform and effective means through the United States
> for preventing the acquisition of the specified firearms by persons under such ages.
> However, under the title, *a minor* or juvenile *would not be restricted from owning,*
> *or learning the proper usage of the firearm,* since *any firearm which his parent or*
> *guardian desired him to have could be obtained for the minor or juvenile by the*
> *parent or guardian.*
>    The clandestine acquisition of firearms by juveniles *and minors* is a most
> serious problem facing law enforcement and the citizens of this country. The
> controls proposed in the title are designed to meet this problem and to substantially
> curtail it.

S. Rep. No. 90-1097, at 79 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2167 (quoted in *NRA*,

700 F.3d at 199) (emphasis added).

The multi-year investigation by Congress "confirmed a 'causal relationship between the

easy availability of firearms other than a rifle or a shotgun and . . . youthful criminal behavior.'"

*NRA*, 700 F.3d at 199 (quoting Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 225-26; *see also id.*

("The greatest growth of crime today is in the area of young people . . . . The easy availability of

weapons makes their tendency toward wild, and sometimes irrational behavior that much more

violent, that much more deadly.") (quoting 1967 Hearings at 57 (testimony of Sheldon S. Cohen,

Comm'r of Internal Revenue)).  "Having found that concealable firearms had been 'widely sold

by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles *and*

*minors* prone to criminal behavior,' Congress concluded that 'only through adequate Federal

control over interstate and foreign commerce in these weapons, and over all persons engaging in

the business of importing, manufacturing, or dealing in them, can this grave problem be properly

---

[3] In the 1968 Act and its accompanying legislative materials, "minor" refers to a person under the age of twenty-one,
and "juvenile" refers to a person under eighteen.  *NRA*, 700 F.3d at 199 n.11.

dealt with, and effective State and local regulation of this traffic be made possible.'"  *Id.* (quoting 82 Stat. at 225, 226) (emphasis added).

The legislative record thus "makes clear that Congress's purpose in preventing persons under 21—including 18-to-20-year-olds—from purchasing handguns from [federally-licensed dealers] was to curb violent crime."  *Id.*

## PROCEDURAL BACKGROUND

Plaintiffs initiated this suit on November 6, 2020.  *See* Compl.  They allege the following facts, which are taken as true solely for purposes of this motion.  Plaintiffs Caleb Reese and Joseph Granich ("the individual plaintiffs") are residents of Louisiana between the ages of eighteen and twenty-one.  *Id.* ¶¶ 6-7.  Plaintiffs Firearms Policy Coalition ("FPC"), Second Amendment Foundation ("SAF"), and Louisiana Shooting Association ("LSA") (collectively, "the organizational plaintiffs") are nonprofit organizations.  *Id.* ¶¶ 8-10.  The individual plaintiffs allege that they are members of the organizational plaintiffs, *id.* ¶¶ 6-7, and that they "desire[] to purchase a handgun and handgun ammunition" for lawful purposes.  *Id.* ¶¶ 18-20, 23-24. Plaintiffs challenge the age qualification under the Second Amendment and equal protection principles.  *Id.* ¶¶ 71-86.[4]

## ARGUMENT

I.   **The Court Should Dismiss for Lack of Subject Matter Jurisdiction Because Plaintiffs Lack Article III Standing.**

"Federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines."  *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019) (citation and alterations in original omitted).  "[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide

---

[4] Paragraphs 82-86 of the complaint are incorrectly numbered "71-74."

whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013) (citation omitted).  To establish standing, a plaintiff "must show: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to [his] conduct; and (3) a favorable judgment is likely to redress the injury." *City of Hearne v. Johnson*, 929 F.3d 298, 300 (5th Cir. 2019) (citation and internal punctuation omitted).

### A.      The Individual Plaintiffs Lack Standing to Sue.

The first requirement of standing is that a plaintiff must have suffered an injury in fact— "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citations and internal punctuation omitted).  The individual plaintiffs fail to plead imminent injury because they have not formed any concrete plan to purchase handguns, and because they may not manufacture injury by foregoing a legally-available option to redress their sole alleged injury.

First, a complaint that simply sets forth a conceivable future scenario in which a plaintiff could suffer harm does not establish an injury in fact.  Here, the individual plaintiffs allege that they "intend[] and desire[]" to purchase handguns from licensed dealers.  Compl. ¶¶ 18, 23.  But "[v]ague" assertions of desire, "without any descriptions of concrete plans," are insufficient to support a finding of actual or imminent injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  The individual plaintiffs' bare conclusory assertions regarding their "inten[t] and desire[]" to purchase handguns—with no specific facts to support them—do not establish injury

because these plaintiffs fail to articulate any concrete plan to purchase handguns from a licensed dealer.  The Supreme Court has made clear that "some day intentions – without any description of concrete plans, or indeed any specification of *when* the some day will be – do not support a finding of the actual or imminent injury that our cases require." *Lujan*, 504 U.S. at 564 (citation and internal punctuation omitted).  At most, these plaintiffs "allege[] only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control," rather than an injury that is "certainly impending." *Id*. at 564 n.2.[5] Because the individual plaintiffs have "failed to establish a serious intention to engage in conduct proscribed by law," they lack Article III standing. *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *see also Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' in [violating a statute, plaintiff] suffered no threat of imminent injury.").

Second, Plaintiffs "cannot allege an injury from one of multiple options where they can choose another which causes them no injury." *Johnson v. U.S. Off. of Pers. Mgmt*., 783 F.3d 655, 667-68 (7th Cir. 2015) (citation and internal punctuation omitted).[6]  The individual plaintiffs "can avoid [their] asserted injury" because they have legally available means by which they may obtain handguns. *Id.* at 668.  Federal law does not bar the individual plaintiffs from possessing a handgun.  Under federal law, their respective parents or guardians may lawfully

---

[5] *See also*, *e.g.*, *Hassan v. United States*, 441 F. App'x 10, 11 (2d Cir. 2011) (holding that a naturalized citizen who "alleges no specific steps toward, or concrete plans in furtherance of, a run for the presidency" had not alleged an injury in fact to challenge the requirement that U.S. Presidents be natural born citizens); *Baz v. DHS*, No. 1:18-cv-01013, 2019 WL 5102827, at *5 (D.D.C. Oct. 11, 2019) (holding that a plaintiff who challenged his inclusion in a no-fly list failed to allege an injury in fact because he never "alleged that he was prevented in the past from boarding flights that merely transit the [United States]" or that "he plans in the relatively near future to board a flight that would transit U.S. airspace").

[6] Defendants are mindful that the Fifth Circuit in *NRA* rejected this particular standing argument, and acknowledge its determination as binding law.  *NRA*, 700 F.3d at 190-92.  Defendants reiterate this argument here in order to facilitate any further judicial review on the standing inquiry.

purchase handguns directly from a federally-licensed dealer and give them to the individual plaintiffs as bona fide gifts.  *See United States v. Moore*, 84 F.3d 1567, 1571 (9th Cir. 1996) (explaining that ATF's "interpretations of [the Act] have always acknowledged parental purchases as an exception to the ban on sales to minors."); ATF Chief Counsel Op. 23362 (Dec. 5, 1983) (attached as Ex. 1).  Because the individual plaintiffs have an available option under federal law for obtaining a handgun, they suffer no injury traceable to Defendants.

> **B.    The Organizational Plaintiffs Lack Standing to Sue in Their Own Right, or on Behalf of Their Members.**

An association "may have standing in its own right to seek judicial relief from injury to itself . . . but even in the absence of injury to itself, an association may have standing solely as the representative of its members."  *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd*., 627 F.3d 547, 550 (5th Cir. 2010) (citation and internal punctuation omitted).  The organizational plaintiffs attempt to assert standing in their own right and on behalf of their members, Compl. ¶¶ 8-10, but none has established standing under either theory.

> **1.    The Organizational Plaintiffs Lack Standing to Sue in Their Own Right.**

"An organization suffers an injury in fact if a defendant's actions perceptibly impair the organization's activities and consequently drain the organization's resources."  *El Paso Cty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020) (citations and internal punctuation omitted). However, the Fifth Circuit has repeatedly emphasized that "[n]ot every diversion of resources to counteract the defendant's conduct . . . establishes an injury in fact."  *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010); *accord El Paso Cty*., 982 F.3d at 343.  For example, "the mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."  *El Paso Cty*., 982 F.3d at 343-44 (citation omitted).

8

Neither SAF nor LSA pleads any organizational injury, Compl. ¶¶ 9-10, and FPC's sole alleged organizational injury is the vague assertion that it "expended and diverted" unspecified "organizational resources to review and analyze" the age qualification, "and communicate with its members and the public" about it.  *Id*. ¶ 8.  But the expenditure of resources to review and analyze laws in preparation for litigation "is insufficient to impart standing upon" FPC.  *El Paso Cty*., 982 F.3d at 343-44; *see also Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999) ("An organization cannot . . . manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.  Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.") (citation omitted).  Moreover, "the organization's reaction to the allegedly unlawful conduct must differ from its routine activities."  *El Paso Cty*., 982 F.3d at 344 (citation omitted); *see NAACP*, 626 F.3d at 238-39 (holding that an organization lacked standing when its purported diversion of resources did not differ from its normal operations).  And FPC concedes that litigation and public outreach form part of its routine activities.  *See* Compl. ¶ 8 (asserting that FPC "serves its members and the public through," *inter alia*, "grassroots advocacy, litigation and legal efforts, . . . education, [and] outreach").  Nor has FPC "identified any specific projects" that it has "had to put on hold or otherwise curtail," or any specific diversion of resources to address the complaint's allegations.  *NAACP*, 626 F.3d at 238-39.

Here, as in *El Paso County*, FPC's "single vague, conclusory assertion that [it] had to divert resources is insufficient to establish that" the challenged laws have "perceptibly impaired the organization's ability to carry out its mission."  *El Paso Cty*., 982 F.3d at 344.  The Fifth Circuit has repeatedly found that such unspecific "conjecture" about resource diversion is insufficient to demonstrate injury in fact.  *See id*.; *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d

298, 306 (5th Cir. 2000) ("conjectural, hypothetical and speculative" diversion of resources does

not establish "concrete and particularized injury").  The organizational plaintiffs thus fail to carry

their burden to establish standing on their own behalf.

### 2. The Organizational Plaintiffs Lack Standing to Sue on Their Members' Behalf.

Under the doctrine of associational standing, an association's standing to bring suit on

behalf of its members arises when, *inter alia*, "its members would otherwise have standing to sue

in their own right."  *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550 (citation omitted).

Here, all three organizational plaintiffs attempt to assert associational standing.  In virtually

identical language, these plaintiffs assert that they are bringing suit on behalf of members  "who

would purchase handguns and handgun ammunition from lawful retailers, and [licensed federal]

retailers who would sell handguns and handgun ammunition to [persons] under the age of

twenty-one" but for the challenged laws.  Compl. ¶¶ 8-10.  However, as explained above,

persons in the first category of alleged members—individuals between eighteen and twenty who

wish to purchase handguns directly from licensed dealers—lack standing to sue because they do

not allege an injury in fact.  *See supra* I.A.  FPC, SAF, and LSA fail to identify any such member

without parents or guardians who may lawfully purchase handguns and handgun ammunition

directly from a licensed dealer and give to that member as a bona fide gift.  Courts have

repeatedly dismissed claims brought by associations under such circumstances.  *See NAACP*, 626

F.3d at 237 (plaintiffs lack associational standing where "there is no evidence in the record

showing that a specific member of the NAACP has been unable to purchase a residence in Kyle"

as a result of the challenged ordinances, or "evidence showing when and how the revised

ordinances may deprive a NAACP member of the opportunity to acquire a new residence in

Kyle"); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (association

members must independently meet standing requirements to give rise to associational standing).

As to the second category of members—licensed firearms dealers—the organizational

plaintiffs also fail to establish standing.  Their allegation of intended sales allegedly frustrated

because of the challenged laws fails because it is not "concrete and particularized."  *Lujan*, 504

U.S. at 560.  Plaintiffs fail to specify any member who was allegedly frustrated from selling any

particular handgun to any person.  Nor does this conclusory allegation factor in the fact that

parents or others can purchase handguns directly from licensed dealers as gifts for eighteen-to-

twenty-year-olds.  Thus, none of the organizational plaintiffs have demonstrated that they

possess associational standing.

## II.     The Court Should Dismiss for Failure to State a Claim on Which Relief Can Be Granted, or Enter Summary Judgment for Defendants.

### A.     Plaintiffs' Claims Are Foreclosed by Binding Fifth Circuit Precedent.

In their complaint, Plaintiffs "acknowledge the Fifth Circuit's decision in [*NRA*]."

Compl. ¶ 4.  Such acknowledgment is warranted because *NRA* squarely forecloses their claims.

Faced with claims virtually identical to those asserted here, the Fifth Circuit rejected them on

their merits.

The individual and organizational plaintiffs in *NRA* challenged the same laws at issue

here on the same grounds.  *NRA*, 700 F.3d at 188.  The Fifth Circuit upheld the entry of summary

judgment in the defendants' favor.  *Id*.  The court began by adopting the "two-step inquiry"

employed by other Courts of Appeals to determine whether laws "comport with the Second

Amendment."  *Id*. at 194.  The first step of this analysis examines "whether the conduct at issue

falls within the scope of the Second Amendment right" by "look[ing] to whether the law

harmonizes with the historical traditions associated with the Second Amendment guarantee."  *Id*.

(citations omitted).  "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster;" if not, however, courts utilize the second step by "apply[ing] the appropriate level of means-ends scrutiny."  *Id.* (citation omitted).  In adopting this framework, the Fifth Circuit observed that that "a longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework."  *Id.* at 196 (citations omitted).  The court further noted that the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), "demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."  *Id.* (citations omitted).

Having determined the relevant framework for analyzing the challenged laws, the Fifth Circuit utilized the framework's first step by "consider[ing] whether" they "burden[ed] conduct that is protected by the Second Amendment."  *Id.* at 199-200.  The court examined sources establishing that "[i]n the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally."  *Id.* at 200 (citations omitted).  The Fifth Circuit further observed that "the term 'minor' or 'infant'—as those terms were historically understood— applied to persons under the age of 21, not only to persons under the age of 18."  *Id.* at 201.  It also noted that "by the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21" and that "19th-century courts and commentators maintained that age-based restrictions on the purchase of firearms. . . comported with the Second Amendment guarantee."  *Id.* at 202-03 (citations and internal punctuation omitted).  Having thus

examined "considerable evidence" that the challenged laws "appear[] consistent with a longstanding tradition of age– and safety-based restrictions on the ability to access arms," the Fifth Circuit determined that "[i]n conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime." *Id*. at 203 (citations omitted).

Notwithstanding the "considerable historical evidence of age– and safety-based restrictions on the ability to access arms" demonstrating that the challenged laws "seem[ed] . . . to be firmly historically rooted," the court proceeded to the second step of its analytical framework "in an abundance of caution." *Id*. at 204.  The Fifth Circuit held that "[u]nquestionably, the challenged federal laws trigger nothing more than 'intermediate' scrutiny," both because they did not represent "a salient outlier in the historical landscape of gun control" and because of the "narrow ambit of [their] target." *Id*. at 205.  The court cited three factors justifying its application of intermediate scrutiny: (1) that "[f]ar from a total prohibition on handgun possession and use, these laws resemble laws imposing conditions and qualifications on the commercial sale of arms, which *Heller* deemed presumptively lawful"; (2) that the laws did not "strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns in defense of hearth and home"; and (3) that "they regulate[d] commercial sales through an age qualification with temporary effect." *Id*. at 206-07 (citations and internal punctuation omitted).

Finally, the Fifth Circuit concluded that the challenged laws satisfied intermediate scrutiny. *Id*. at 207-11.  The laws were enacted after Congress had "conducted a multi-year

investigation that revealed a causal relationship between the easy availability of firearms to young people under 21 and the rise in crime." *Id*. at 207; *see also id*. at 208 (noting Congress's determination that "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault, and 21 percent of the arrests for murder") (citation and internal punctuation omitted).  The legislative record also "demonstrate[d] that Congress was particularly concerned with the [licensed dealer's] role in the crime problem," and "reflect[ed] Congress's concern with the particular type of weapon that is predominantly used by the criminal and that is principally used in the commission of serious crime—*i.e.*, the handgun." *Id*. (citations and internal punctuation omitted).  The Fifth Circuit thus found that for several reasons, "the government has satisfied its burden of showing a reasonable means-ends fit between the challenged federal laws and an important government interest." *Id*. at 208-09.  First, "curbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from [licensed dealers]—constitutes an important government objective.  *Id*. at 209 (citation omitted).  Second, "Congress selected means that were reasonably adapted to achieving that objective" by "reasonably tailor[ing] a solution to the particular problem" at hand." *Id*.  Third, data following the laws' enactment only further "confirm[ed] that preventing handguns from easily falling into the hands of 18-to-20-year-olds remains critical to public safety." *Id*. at 210.

The Fifth Circuit thus held that the challenged laws were consistent with the Second Amendment. *Id*. at 211.  It also rejected the plaintiffs' equal protection claims, holding that for the same reasons that the laws satisfied intermediate scrutiny, they also satisfied rational basis review. *Id*.  Accordingly, as Plaintiffs' Second and Fifth Amendment claims are plainly

foreclosed by *NRA*'s binding precedent and rationale, their complaint must be dismissed for failure to state a cognizable claim.

> **B.      In Any Event, None of Plaintiffs' Arguments Cast Doubt on the Soundness of the Fifth Circuit's *NRA* Decision or Bring This Case Outside Its Ambit.**

The complaint presents three arguments as to why Plaintiffs believe the challenged laws are inconsistent with the Second and Fifth Amendments.  First, Plaintiffs rely on the fact that at present, eighteen is the age of majority in most states.  *See* Compl. ¶¶ 28-29.  Second, Plaintiffs rely on present-day and historical militia laws.  *Id*. ¶¶ 30-34, 49-55, 58.  Third, Plaintiffs observe that the challenged laws constitute restrictions on the purchase of handguns.  *Id*. ¶¶ 42-46. However, none of these three arguments either bring this case outside the ambit of the Fifth Circuit's binding decision in *NRA* or cast any doubt on the soundness of that decision.

> **1.      As *NRA* Recognized, Legislative Discretion Includes the Ability to Prescribe an Age Qualification Within a Historically-Established Range for the Exercise of Rights and Privileges That Collectively Constitute Adulthood.**

The Fifth Circuit in *NRA* determined that that the age qualification "appears consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms." *NRA*, 700 F.3d at 203.  It specifically noted that "the term 'minor' or 'infant'—as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18."  *Id.* at 201.  "The age of majority at common law was 21, and it was not until the 1970s that States enacted legislation to lower the age of majority to 18."  *Id*. (citations omitted). "So most right-to-bear-arms laws were passed while 18-to-20-year-olds were minors."  *Horsley v. Trame*, 808 F.3d at 1130 (citation omitted).  Thus, contrary to Plaintiffs' assertion, it is irrelevant that most states currently set the age of majority at eighteen, rather than twenty-one. *See* Compl. ¶¶ 28-29.  The mere fact that many states have chosen to do so does not mean that

Congress could not make distinctions based on the historically-understood age of majority when it enacted the Act.

Indeed, the Fifth Circuit in *NRA* specifically rejected the contention that "a Second Amendment right to purchase firearms from [licensed dealers] vests at age 18 because the age of majority is now 18" given that "'majority or minority is a status,' not a 'fixed or vested right.'" *NRA*, 700 F.3d at 205 n.17 (quoting Jeffrey F. Ghent, *Statutory Change of Age of Majority as Affecting Pre-existing Status or Rights*, 75 A.L.R.3d 228 § 3 (1977)) (alteration omitted); *see also*, *e.g.*, *Morrissey v. Perry*, 137 U.S. 157, 159 (1890) ("The age at which an infant shall be competent to do any acts or perform any duties . . . depends wholly on the legislature."); *Jones v. Jones*, 72 F.2d 829, 830 (D.C. Cir. 1934) (noting that "the Legislature may regulate the age of majority for infants in all cases, or for specified purposes only").  Because majority is merely a status, and does not confer any fixed or vested rights, the age at which many or most states currently set their age of majority thus has no constitutional significance.  It follows from this fact that "in the absence of an express constitutional inhibition, the legislature has the power to fix or change the age at which persons reach majority or at which infants are deemed competent to perform certain acts or duties."  42 Am. Jur. 2d Infants § 6 (citing authority).  "There is no legal requirement that the same age of majority apply to all activities and circumstances, and statutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature."  *Id*. (citing authority).  In short, "[t]he terms 'majority' and 'minority' lack content without reference to the right at issue."  *NRA*, 700 F.3d at 205 n.15.  This is true even for important constitutional rights such as the right to serve on a jury, *United States v. Dukes*, 479 F.2d 324, 326 (5th Cir. 1973); *United States v. Olson*, 473 F.2d 686,

16

687-88 (8th Cir. 1973), or the right to hold state public office, *Blassman v. Markworth*, 359 F. Supp. 1, 5-6 (N.D. Ill. 1973).

And nothing in the Constitution or federal law prevents Congress from selecting twenty-one as the age minimum for the direct purchase of handguns from licensed dealers.  The Constitution establishes only one right that vests at the age of eighteen—voting.  U.S. Const. amend. XXVI, § 1.  And "[n]either the Twenty-Sixth Amendment nor state law setting the age of majority at 18 compels Congress or the States to select 18 as the minimum age to purchase alcohol, lottery tickets, or handguns."  *NRA*, 700 F.3d at 205 n.17.

In short, nothing prevents legislatures from "un-bundling" the set of rights and privileges that are collectively deemed to constitute adulthood, and establishing different minimum ages for different conduct.  Thus, "[s]eventeen-year-olds may not vote or serve in the military, while 18-year-olds may," and "[t]wenty-year-olds may not purchase alcohol (by state statute), purchase lottery tickets in some States, purchase handguns in some States (by state statute), or purchase handguns from [licensed dealers] (by federal statute)—while 21-year-olds may."  *NRA*, 700 F.3d at 205 n.17 (internal citation omitted).  Today, "[m]any States (and the District of Columbia) proscribe or restrict the sale of handguns to persons under 21 (by non-[licensed dealers]) or the possession of handguns by persons under 21."  *Id*. at 190 n.4 (citations omitted).[7]  Because, as explained above, Congress enacted the age requirement to prevent individuals from circumventing state restrictions (including minimum age requirements) by crossing state lines, *see supra* Statutory Background at II, Congress sensibly chose twenty-one as the age to prevent such circumvention.

---

[7] Additionally, New Mexico's minimum age for handgun possession is nineteen.  N.M. Stat. Ann. § 30-7-2.2.

2.      **The Fifth Circuit Also Rejected "Militia-Based Attack[s]" on the Age Qualification Because Militia Laws Do Not Suggest That Individuals Under Twenty-One Have the Right to Directly Purchase Handguns from Licensed Dealers.**

Plaintiffs' arguments rely heavily on the existence of militia laws, both past and present. Thus, Plaintiffs note that U.S. law designates male citizens over eighteen are designated members of the federal militia, and that many states also designate citizens over eighteen as members of their respective state militias.  Compl. ¶¶ 30-34.  Plaintiffs also make similar observations with respect to some colonial and founding-era militia laws.  *Id.* ¶¶ 48-55.  As in *NRA*, here, Plaintiffs' "militia-based attack on the federal laws at bar is unavailing" for three key reasons.  *NRA*, 700 F.3d at 204 n.17.

First, "the right to arms is not co-extensive with the duty to serve in the militia."  *Id.* (citing *Heller*, 554 U.S. at 589-94).  The issue in *Heller* was not the constitutional scope of the right to carry arms in the context of militia service.  *See Heller*, 554 U.S. at 577 ("[Heller] argues that [the Second Amendment] protects an individual right to possess a firearm *unconnected with service in a militia*, and to use that arm for traditionally lawful purposes, such as self-defense within the home.") (emphasis added); *id*. at 579 n.5 (the right to bear arms "is still an individual right, and not one conditioned upon membership in some defined 'assembly,' as [Justice Stevens] contends the right to bear arms is conditioned upon membership in a defined militia").  Indeed, *Heller* specifically concluded that the right protected by the Second Amendment had "*nothing whatever* to do with service in a militia."  *Id*. at 593 (emphasis added).  Instead, the Supreme Court dealt with whether possession of a handgun for self-defense in the home is a right protected by the Second Amendment.  *Heller*, 554 U.S. at 598-99, 635-36.[8]  *Heller* did examine

---

[8] Moreover, the majority's opinions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), did not recite the "well-regulated militia" language even once, even as dicta.  *See id*. at 749-91 (plurality opinion); *id*. at 791-805 (Scalia, J., concurring); *id*. at 805-58 (Thomas, J., concurring).

the prefatory "well-regulated militia" language of the Second Amendment, *id*. at 595-99, but explained that this language "does not suggest that preserving the militia was the only reason Americans value the ancient right."  *Id*. at 599.

Plaintiffs thus err by conflating "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id*. at 635, which was at issue in *Heller*, with the duty of participating in the common defense as part of a militia.  *See also United States v. Emerson*, 270 F.3d 203, 241 (5th Cir. 2001) (noting that in the proposed amendment by the Pennsylvania convention that ratified the Constitution, "'bear arms' clearly pertains to private, civilian wearing or carrying of arms and the power of the state to organize, arm and discipline the militia is in a separate section, indicating that the Anti-Federalists viewed these issues as distinct").

Moreover, it is consistent with the historical understanding of the right to bear arms to consider individuals under twenty-one suitable for the duty to bear arms under militia leadership, training, and control, but to restrict their purchase of firearms in a non-militia setting.  As explained above, *see supra* II.B.1, during the Founding Era, persons under twenty-one were considered minors or infants.  And even during this era, the bearing of arms in the militia was "well regulated" and did not entail members using firearms unchecked without supervision. While "'a well-regulated Militia' refers *not* to a special or select subset or group taken out of the militia as a whole [it did refer] to the condition of the militia as a whole, namely being well disciplined and trained."  *Emerson*, 270 F.3d at 234-35; *see also Heller*, 554 U.S. at 597 ("[W]ell-regulated" implies "proper discipline and training."); Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights*, 9 Geo. J.L. & Pub. Pol'y 323, 326 (2011) ("The right to 'keep and bear arms' in a 'well-regulated militia' was not a license to individually train or discharge firearms.") (citing militia statutes).

19

In any event, the relevant issue here is not the right to use arms in a national or state militia.  Neither of the individual plaintiffs allege that he has enrolled, has attempted to enroll, or has been denied access to "keep and bear arms" in a national or state militia.  And because the age qualification in no way prevents these plaintiffs from enrolling in the federally-organized and state-trained militia, it has nothing to do with any duty on the part of a "well-regulated militia" to "keep and bear arms."  In short, because the right recognized in *Heller* had "nothing whatever to do with service in a militia," 554 U.S. at 593, the relevance of militia laws to the present case is questionable at best.

Second, "if the right to arms and the duty to serve in the militia were linked in the manner that [Plaintiffs] declare, then [their] argument proves too much."  *NRA*, 700 F.3d at 204 n.17. "In some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia," but Plaintiffs "are not challenging restrictions on handgun possession by or sales to persons under age 18."  *Id*. (citation omitted); *see* Compl. at Counts I-II (challenging age qualification only with respect to persons between eighteen and twenty-one). The Fifth Circuit's observation underscores the mistaken assumption from which Plaintiffs proceed here: that if a past legislature selected some particular minimum age for militia service, it thereby bestowed a protected right in the incidents of militia service in persons of that age that cannot be changed by later legislation. But "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co*., 470 U.S. 451, 465-66 (1985) (citation omitted).  Otherwise, the unavoidable implication of Plaintiffs' argument is that by requiring

sixteen-year-olds to serve in the militia, colonial legislatures bestowed on persons of that age an inalienable right to all the incidents of militia service.

Third, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17 (citations omitted).  "Such fluctuation undermines [Plaintiffs'] militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later." *Id*.  As explained above, *see supra* II.B.1, it is well established that legislatures have significant discretion in raising or lowering the minimum age for individuals to gain certain rights or privileges.  One of these is the privilege of serving in a militia.  As history demonstrates, both Congress and the states retain the discretion of raising and lowering the minimum age for service in the national or state militia.  Thus, even if the duty to serve in a militia bears some relation to the right protected by the Second Amendment—which is doubtful—history and tradition demonstrate that legislatures possess significant discretion in selecting the minimum age for such service.

Additionally, *NRA* shows that Plaintiffs misplace their reliance on a 1792 federal militia law.  *See* Compl. ¶ 52 (citing Second Militia Act of 1792, 1 Stat. 271 ("Militia Act")).  That law "gave States discretion to impose age qualifications on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21." *NRA*, 700 F.3d at 205 n.17 (citation omitted).

Indeed, the Militia Act provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (*except as is herein after excepted*) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271 (emphasis added).  And in the very next section, that Act made clear that "all persons who now are or may hereafter be

21

exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, *notwithstanding their being above the age of eighteen*, and under the age of forty-five years." *Id.* § 2, 1 Stat. at 272 (emphasis added).  Congress' and the states' exercise of discretion in creating such exemptions is at odds with the notion that the Militia Act—or indeed, any militia laws—bestowed any rights on eighteen-to-twenty year olds to serve in a militia.[9]

Finally, the Fifth Circuit in *NRA* focused its attention on the "anachronism at play" in the militia-based arguments in that case, in that "we no longer have a founding-era-style militia." *NRA*, 700 F.3d at 205 n.17.  This observation similarly dooms Plaintiffs' reliance on provisions of contemporary militia laws in support of their arguments.  *See* Compl. ¶¶ 30 (citing federal law), 31-34 (citing California and Louisiana militia laws).

Federal law cited by Plaintiffs divides the class of all "able-bodied males" between seventeen and forty-five into the "organized militia," consisting of "the National Guard and the Naval Militia," and the "unorganized militia."  *See id.* ¶¶ 30, 58 (citing 10 U.S.C. § 246).  Many state laws contain similar provisions.  *See, e.g.*, La. Stat. Ann. § 29:3.  But because neither of the individual plaintiffs contends that he has joined the U.S. National Guard, Naval Militia, or a state militia, they lack standing to make any claim based on any such membership.  And as for the "unorganized militia," federal and state law simply designates its membership without conferring any rights or statutory protection to such members.  *See, e.g.*, *United States v. Zaleski*, 489 F.

---

[9] Nor do Plaintiffs' arguments based on other historical materials cast any doubt on the Fifth Circuit's holding in *NRA*.  *See* Compl. ¶¶ 53-54.  Plaintiffs fail to note that the militia plan suggested by Secretary of War Henry Knox "found little favor in Congress" and died in committee.  John McAuley Palmer, *America in Arms: The Experience of the United States with Military Organization* 43 (1941).  And although during legislative debates on the Militia Act, one representative did opine that "from eighteen to twenty-one was found to be the best age to make soldiers of," *see* Compl. ¶ 54, this opinion was not shared by all.  For example, Representative Elias Boudinot (who introduced the bill that became the Militia Act) "very much disapproved the idea of making a soldier of every man between eighteen and forty-five years of age – there is a manifest impropriety in the measure."  2 Annals of Cong. 1805 (1790).  Finally, while it is true that in 1783, George Washington recommended that citizens from eighteen to fifty be enrolled in the militia, Compl. ¶ 54, this was merely a personal recommendation rather than a legal directive or a legal interpretation of the right to bear arms.

App'x 474, 475 (2d Cir. 2012) (rejecting contention that individual had right to possess machine guns based on his "membership in the unorganized militia of the State of Connecticut").  Rather, such statutes merely constitute statements of nominal authority by the federal and state governments for purposes of military manpower, by designating individuals presumptively "subject to military duty."  La. Stat. Ann. § 29:3(B)(2).  Congress and the states continue to maintain the discretion to exempt persons from service in the militia.  *See, e.g., id*. § 29:3(A) (providing that "[a]ll able-bodied persons" of designated age "who are not exempt by the laws of the United States of America or of this state" constitute the state militia).

Eighteen-to-twenty year olds are thus indisputably eligible for military service.  But such eligibility neither bestows a right to unrestricted use of firearms by such individuals, nor implies anything about the rights of civilians under twenty-one regarding the purchase of firearms from licensed dealers for personal use.  Even when serving military personnel are required to be armed for the performance of their official duties, they may only carry such arms on or off Department of Defense property "when authorized."  U.S. Dep't of Def., *DOD Directive 5210.56: Arming and the Use of Force* (Nov. 18, 2016), §§ 1.2(a), 3, https://fas.org/irp/doddir/dod/d5210_56.pdf. Military personnel wishing to carry a privately-owned firearm on Defense Department property for personal protection purposes not related to the performance of official duties must request permission to do so, and must be twenty-one or older.  *Id*. §§ 1.2(e), 4.3(b).  Thus, the U.S. military's practice is to extensively regulate firearms.  *See id*. § 1.2(i) ("Except as permitted in this issuance or as specifically permitted in other applicable DoD policy, the possession of a privately owned firearm on DoD property is prohibited.").  In any event, as a matter of policy, it is appropriate for Congress to distinguish between the privileges and responsibilities afforded to

active service personnel in the U.S. armed forces, and those afforded to civilians, and as noted above, neither of the individual plaintiffs serves in the U.S. military.

In sum, nothing in the militia laws cited by Plaintiffs either brings this case outside the ambit of the Fifth Circuit's decision in *NRA* or casts doubt on that decision's holding.

### 3. *Heller* Expressly Allows for "Measures Regulating Handguns," Including "Conditions and Qualifications" on Their Commercial Sale.

Finally, contrary to Plaintiffs' assertion, the mere fact that the age qualification regulates the purchase of handguns does not render it constitutionally impermissible.  Both *Heller* and *NRA* specifically noted the outlier status of the firearms law struck down in that case.  *See NRA*, 700 F.3d at 193 (explaining that "the ban on home handgun possession" at issue in *Heller* "squarely struck the core of the Second Amendment—a rare feat, as the Court observed that '[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban'") (quoting *Heller*, 554 U.S. at 629).  By contrast, during the 1800s and shortly thereafter, "a number of states enacted . . . statutes prohibiting the transfer of deadly weapons— often expressly handguns—to juveniles."  *NRA*, 700 F.3d at 202 (quoting *United States v. Rene E.*, 583 F.3d 8, 14 (1st Cir. 2009)).  Indeed, to date, twenty-nine states (and the District of Columbia) have enacted minimum-age qualifications on the purchase or use of handguns— usually defined as pistols, revolvers, weapons of "like kind or character," or concealable weapons including firearms—rather than on all firearms.[10]

Moreover, the age qualification is not remotely akin to the District of Columbia's former law, which prohibited every law-abiding citizen from possessing handguns in his or her home, or

---

[10] Alabama, California, Colorado, Connecticut, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.  *See* Ex. 2.  Eighteen of these States and the District of Columbia had Second Amendment analogues in their respective constitutions when they enacted these qualifications.  *See id.*

from rendering operable any lawful firearm he or she possessed at home.  *See Heller*, 554 U.S. at 574-75.  "Far from a total prohibition on handgun possession and use, these laws resemble 'laws imposing conditions and qualifications on the commercial sale of arms,' which *Heller* deemed 'presumptively lawful.'"  *NRA*, 700 F.3d at 206 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).  The Supreme Court in *Heller* made clear that it was not ruling out all regulation of handguns, to the exclusion of other firearms: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.  The Constitution leaves the District of Columbia a *variety of tools* for combating that problem, *including some measures regulating handguns*, *see supra*, at 2816-2817, and n.26."  *Heller*, 554 U.S. at 636 (emphasis added).  The Court's internal reference was to the list of "presumptively lawful regulatory measures" that includes "laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 626-27, 627 n.26.  Thus, a law imposing a qualification on the commercial sale of handguns such as the age qualification for purchasing handguns from a licensed dealer remains valid after *Heller*.[11]

It is also noteworthy that, by contrast with the law at issue in *Heller*, the age qualification neither bans handgun possession nor places any restrictions on the legitimate possession of firearms in the home.  Rather, it is a temporary restriction on the direct sale of handguns by a particular type of seller (licensed firearms dealers) to a particular class of individuals (those under twenty-one years of age).  *See NRA*, 700 F.3d at 206-07 (explaining that the age qualification does not "prevent 18-to-20-year-olds from possessing and using handguns in defense of hearth and home" but instead allows them to "possess and use handguns for self-

---

[11] Moreover, the legislative history of the age qualification "reflects Congress's concern with the 'particular type of weapon that is predominantly used by the criminal' and that is 'principally used in the commission of serious crime'—i.e., the 'handgun.'  The handgun's size made it easy to carry and conceal, which in turn made it susceptible to 'clandestine acquisition' and 'criminal use.'"  *NRA*, 700 F.3d at 208 (citations omitted).

defense, hunting, or any other lawful purpose [and to] acquire handguns from responsible parents or guardians") (citations and internal punctuation omitted).  Because the age qualification "regulate[s] commercial sales through an age qualification with temporary effect," the "temporary nature of the burden reduces its severity."  *Id*. at 207; *see id*. (noting that eighteen-to-twenty year olds subject to the qualification "will soon grow up and out of its reach").

Additionally, since *Heller*, courts have upheld laws despite the fact that they regulated the purchase or possession of handguns.  *See, e.g.*, *Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) (rejecting challenge to requirement of good cause to possess license to carry concealed handgun); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 88-101 (2d Cir. 2012) (similar).  Consequently, the mere fact that the age qualification applies to the purchase of handguns does not render it constitutionally suspect.[12]

> \*               \*               \*               \*               \*               \*

In sum, none of Plaintiffs' arguments either bring this case outside the scope of *NRA*'s holding or its rationale, or cast doubt on the soundness of the Fifth Circuit's decision.  At bottom, Plaintiffs' arguments are policy-based and intended to support their opinion that Congress *should* have chosen a different minimum age for the direct purchase of handguns from licensed dealers. Such contentions would be better addressed to a legislative body, as "'[u]nder the system of government created by our Constitution, it is up to the legislatures, not the courts, to decide on the wisdom and utility of legislation.'"  *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007) (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963)).

---

[12] For the same reasons that the age qualification is consistent with the Second Amendment, it is also consistent with principles of equal protection.

**CONCLUSION**

Because Plaintiffs fail to meet the requirements for standing, the Court lacks subject

matter jurisdiction.  Plaintiffs' claims are also barred by binding Fifth Circuit precedent.  The

Court should therefore dismiss this case or enter summary judgment for Defendants.

Dated:  April 15, 2021                    Respectfully submitted,


                                          BRIAN M. BOYNTON
                                          Acting Assistant Attorney General

                                          LESLEY FARBY
                                          Assistant Branch Director



                                            /s/ *Daniel Riess*
                                          DANIEL RIESS (Texas Bar No. 24037359)
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C.  20005
                                          Tel: (202) 353-3098
                                          Fax: (202) 616-8460
                                          Daniel.Riess@usdoj.gov
                                          *Attorneys for Defendants*