**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

CALEB REESE, et al.,

     *Plaintiffs*,

   v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.,

     *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No.
6:20-cv-01438

**BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT OR FOR SUMMARY JUDGMENT**

Dated:  June 3, 2021

Timothy R.W. Kappel (Bar No. 32881)
WELLS & KAPPEL LLP
1615 Poydras Street, Suite 900
New Orleans, Louisiana  70112
(504) 905-2012
tkappel@wellskappel.com

*Counsel of Record for* Amicus Curiae *Giffords
Law Center to Prevent Gun Violence*

*Of Counsel for* Amicus Curiae *Giffords Law
Center to Prevent Gun Violence:*

Hannah Shearer
Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA  94104
(415) 433-2062

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY  10018
(917) 680-3473

Robert A. Sacks
Leonid Traps
D. Wil Gould
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498
(212) 558-4000

Angela N. Ellis
Rachel H. VanGelder
Madeline B. Jenks
Alexander L. Minore
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC  20006
(202) 956-7500

## <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF THE *AMICUS CURIAE* ...........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ........................................................................................................4

    I.       At Most, the Challenged Laws' Restriction on Some Handgun Purchases by 18-to-20-Year-Olds Triggers Intermediate Scrutiny ........................5

    II.     The Challenged Laws Easily Survive Intermediate Scrutiny ..................................6

         A.     Congress Enacted "Calibrated" Laws to Address the Problem of Handgun Violence by Minors Under the Age of 21 ...................................7

         B.     Extensive Evidence Confirms that the Challenged Laws Are a Data-Driven Solution to Promote Public Safety by Reducing Gun Violence ...........................................................................10

             1.     Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts....................................................................... 10

             2.     Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms........................................ 13

             3.     Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts ............. 18

             4.     Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors ...................................... 21

    CONCLUSION.................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018)................................................................................1

*Bolling* v. *Sharpe*,
  347 U.S. 497 (1954)...........................................................................................18

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008)........................................................................................1, 3

*Glass* v. *Paxton*,
  900 F.3d 233 (5th Cir. 2018) .............................................................................1

*Gould* v. *Morgan*,
  907 F.3d 659 (1st Cir. 2018)..............................................................................4

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  417 F. Supp. 3d 747 (W.D. Va. 2019) ...........................................................1, 10

*Horsley* v. *Trame*,
  808 F.3d 1126 (7th Cir. 2015) .....................................................................10, 11

*Kolbe* v. *Hogan*,
  849 F.3d 114 (4th Cir. 2017) (en banc) ............................................................4

*Mance* v. *Sessions*,
  896 F.3d 390 (5th Cir. 2018) (Higginson, J., concurring) ..............................4

*Mance* v. *Sessions*,
  896 F.3d 699 (5th Cir. 2018) ..........................................................................5, 9

*McDonald* v. *City of Chicago*,
  561 U.S. 742 (2010)........................................................................................1, 3

*Md. Shall Issue* v. *Hogan*,
  353 F. Supp. 3d 400 (D. Md. 2018) ...................................................................1

*Mitchell* v. *Atkins*,
  483 F. Supp. 3d 985 (W.D. Wash. 2020).........................................................10

*N.Y. State Rifle & Pistol Ass'n, Inc.* v. *Cuomo*,
  804 F.3d 242 (2d Cir. 2015)...............................................................................9

*Nat'l Paint & Coatings Ass'n* v. *City of Chicago*,
45 F.3d 1124 (7th Cir. 1995) ................................................................24

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
700 F.3d 185 (5th Cir. 2012) ......................................................... *passim*

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
719 F.3d 338 (5th Cir. 2013) ..................................................................6

*People* v. *Fields*,
24 N.E.3d 326 (Ill. App. Ct. 2014) ......................................................13

*Peruta* v. *County of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc) (Graber, J., concurring)............1

*Stimmel* v. *Sessions*,
879 F.3d 198 (6th Cir. 2018) ..................................................................1

*Turner Broad. Sys., Inc.* v. *FCC*,
512 U.S. 622 (1994).................................................................................7

*Turner Broad. Sys., Inc.* v. *FCC*,
520 U.S. 180 (1997).................................................................................7

*United States* v. *Chapman*,
666 F.3d 220 (4th Cir. 2012) ................................................................17

*United States* v. *Marzzarella*,
614 F.3d 85 (3d Cir. 2010).......................................................................7

*United States* v. *Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ..................................................................7

*United States* v. *McGinnis*,
956 F.3d 747 (5th Cir. 2020) ..................................................................5

*United States* v. *Staten*,
666 F.3d 154 (4th Cir. 2011) ................................................................17

*United States* v. *Virginia*,
518 U.S. 515 (1996)...............................................................................18

**Statutes, Rules, and Regulations**

18 U.S.C. § 922(b)(1), (c) ............................................................ *passim*

27 C.F.R. § 478.96(b) ................................................................... *passim*

27 C.F.R. § 478.99(b)(1) ................................................. *passim*

27 C.F.R. § 478.124(a) ................................................... *passim*

Pub. L. No. 90-351, Title IV, § 901, 82 Stat. 197 (1968) ...........................8, 9

Pub. L. No. 90-618, Title I, § 101, 82 Stat. 1213 (1968) ................................7

U.S. Const. amend. II ....................................................... *passim*

**Legislative Materials**

114 Cong. Rec. 12309 (1968) ..............................................2, 8, 10

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 67 (1965)............................2, 9

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967)................................8

S. Rep. No. 88-1340 (1964) ......................................................8

S. Rep. No. 89-1866 (1966) ....................................................2, 9

S. Rep. No. 90-1097 (1968) ......................................................8

**Other Authorities**

Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016)........................................10

American Public Health Association, *Reducing Suicides by Firearms* (Nov. 13, 2018) .......................................................................20

Associated Press, *At Least 2 Handguns Used in School Shooting Near Columbine*, MPR NEWS (May 8, 2019).....................................................14

Andrew R. Morral et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018) ....................13

Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST (last updated May 10, 2021)....................................16

Bureau of Alcohol, Tobacco, and Firearms Chief Counsel's Opinion 23362 (Dec. 5, 1983) ....................................................................8

Bureau of Alcohol, Tobacco, and Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* 18 (June 2000)...........................17, 18

Centers for Disease Control and Prevention, Web-based Injury Statistics Query
and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981-
2019*...................................................................................................................20

Centers for Disease Control and Prevention, Web-based Injury Statistics Query
and Reporting System (WISQARS), *Nonfatal Injury Report, 2015-2019* ......................17, 18

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and
Youth Suicides*, 292 JAMA 594 (2004) ...................................................22

Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS
HOPKINS CTR. FOR GUN POLICY & RESEARCH 1 (2012)..........................................13

*Deadliest Mass Shootings in the US Fast Facts*, CNN (last updated Apr. 14, 2021)...................14

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103
AM. J. PUB. HEALTH 27 (2013) ...................................................................19

Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How
Much Time Is Left for Intervention Between Consideration and
Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19 (2009)...........................19

Eboni Morris, Nat'l Urb. League Pol'y Inst., Youth Violence: Implications for
Posttraumatic Stress Disorder in Urban Youth 7 (2009) ...........................................15

Evan Perez et al., *What We Know About Dimitrios Pagourtzis, the Alleged Santa
Fe High School Shooter*, CNN (last updated May 21, 2018) ....................................14

Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*,
HUFFINGTON POST (Sept. 24, 2012)............................................................15

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed
Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094
(2016)............................................................................................21

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov.
7, 2016) ........................................................................................21

Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, PAC.
STANDARD (Mar. 25, 2019) ...................................................................15

Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the
United States*, THE VIOLENCE PROJECT 19 (Nov. 2019)...........................................16

Jillian Peterson & James Densley, *School Shooters Usually Show These Signs of
Distress Long Before They Open Fire, Our Database Shows*, THE
CONVERSATION (Feb. 8, 2019)..................................................................16

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26 (2013)..........................................................................................22

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010)...........................................................................11, 12

Luis Melgar, *Are School Shootings Becoming More Frequent?  We Ran the Numbers*, Ctr. for Homeland Defense & Security (May 21, 2019) ..........................15

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE AND TREATMENT 449 (2013) ........................................................10, 11, 12

Matthew Miller & David Hemenway, *Firearm Prevalence and the Risk of Suicide:  A Review*, 2 HARV. HEALTH POL'Y REV. 29 (2001)....................................20

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 N. ENGL. J. MED. 989 (2008) ...........................................................................20

Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57 (2002) ...........................................................................................................12

Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393 (2012) ...................................21

Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 SOC. SCI. J. 168 (2015)....................................................................................................22, 23

*Mass Shootings in America*, Everytown Rsch. & Pol'y (Apr. 14, 2021) .....................16

*Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE ....................................19

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES OF GENERAL PSYCHIATRY 1058 (2011) ...............19

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 Developmental Neuroscience 220 (2014)...........................................12

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2 (2019). ...............................................................23

*Police Release Names of 8 Victims in Indianapolis Shooting*, N.Y. TIMES (Apr. 18, 2021) ......................................................................................................14

Richard A. Friedman, *Why Are Young Americans Killing Themselves?  Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES (Jan. 6, 2020) ...............................12

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLLEGE SURGEONS 150 (2019)......................................................................................................................................23

Susan B. Sorenson & Douglas J. Wiebe, *Weapons in the Lives of Battered Women*, 94 AM. J. PUB. HEALTH 1412 (2004)........................................................................18

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49 (2001)............................19

Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVIEWS NEUROSCIENCE 947 (2008) .............................................18

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019 ...........................................................................................13

U.S. Department of Justice, *Crime in the United States*, Arrests by Age, 2019, at Table 38 ...............................................................................................................................13

U.S. Department of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (June 2018)...............................................................................................................23

U.S. Military Academy Regulation 190-3 at § II.1-6(b)(1)............................................................12

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, (SUPP.) 17 J. STUD. ON ALCOHOL & DRUGS 108 (2014) ...........................22

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 5.6 of the Western District of Louisiana, Giffords Law Center to Prevent Gun Violence certifies as follows:

Giffords Law Center to Prevent Gun Violence has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence.  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.  Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities.  Giffords Law Center has provided informed analysis as an *amicus* in many firearm-related cases, including in *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747 (W.D. Va. 2019), *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), and *Glass* v. *Paxton*, 900 F.3d 233 (5th Cir. 2018).[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the Fifth Circuit has previously held, the longstanding minimum age rules challenged in this lawsuit do not implicate the Second Amendment, and easily "pass[]

---

[1]      *Amicus* Giffords Law Center submits this brief in support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint or for Summary Judgment. (ECF No. 32.)  No counsel for a party authored this brief in whole or in part.  No person other than *amicus* or its counsel contributed money to fund this brief's preparation or submission.

[2]      Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *E.g.*, *Hirschfeld*, 417 F. Supp. 3d at 754, 759; *Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring).  Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

constitutional muster."[3]   Congress enacted the laws at issue here 50 years ago, following an extensive, "multi-year investigation" into rising rates of gun violence.[4]   That investigation "revealed a causal relationship between the easy availability of firearms to young people under 21 and [a] rise in crime."[5]   In particular, Congress determined that (i) minors under the age of 21 committed a disproportionate share of "serious crimes of violence, including murder, rape, robbery, and aggravated assault";[6] (ii) handguns were the "predominant[ ]" type of weapon used in such crimes;[7] (iii) minors frequently evaded state firearm restrictions by crossing state lines to buy handguns;[8] and (iv) federally licensed dealers were responsible for "almost all" handgun sales to minors.[9]

Confronted with these troubling findings, Congress crafted targeted, "safety-driven"[10] legislation that prohibits federally licensed dealers ("Federal Firearms Licensees" or "FFLs") from selling handguns to minors under the age of 21.  *See* 18 U.S.C. § 922(b)(1), (c); 27 C.F.R. §§ 478.99(b)(1), 478.124(a), 478.96(b) (collectively the "Challenged Laws").   This

---

[3]      *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 203, 207 (5th Cir. 2012) ("*NRA*"), *reh'g en banc denied*, 714 F.3d 334 (5th Cir. 2013), *cert. denied*, 571 U.S. 1196 (2014).

[4]      *Id.* at 207.

[5]      *Id.*

[6]      114 Cong. Rec. 12309 (1968) (Sen. Thomas J. Dodd, Chairman, Sen. Subcomm. on Juvenile Delinquency).

[7]      S. Rep. No. 89-1866, at 4 (1966).

[8]      *Id.* at 19.

[9]      *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen, Commissioner of Internal Revenue).

[10]      *NRA*, 700 F.3d at 199.

solution was carefully "calibrated"[11] to the specific public safety concerns Congress identified and has been effective in addressing them.  Subsequent developments in neuroscience and social science in recent decades further confirm Congress's findings and the wisdom of its solution: minors under 21 with easy access to firearms pose a substantial risk to themselves and others because their brains are still developing.  Studies show a connection between age restrictions and a decline in firearm-related adolescent deaths.

For these reasons—and because, as explained in Defendants' brief, the laws Plaintiffs challenge are consistent with a longstanding, historical tradition of restricting minors' access to firearms—the Challenged Laws simply do not hinder "the central right that the Second Amendment was intended to protect[,] that is, the 'right of law-abiding, *responsible* citizens to use arms in defense of hearth and home.'"[12]  Indeed, the Challenged Laws are in line with, and complementary to, the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms" that were specifically recognized as constitutional by the Supreme Court.[13]  Accordingly, as this Circuit previously held when evaluating a nearly identical challenge in *NRA*,[14] the Challenged Laws do not implicate the Second Amendment,[15] and, even if they did, would easily "pass[]

---

[11]    *Id.* at 209.

[12]    *Id.* at 193 (emphasis in original) (quoting *Heller*, <u>554 U.S. at 635</u>).

[13]    *Heller*, <u>554 U.S. at 626-27</u>; *see also McDonald*, <u>561 U.S. at 786</u>.

[14]    <u>700 F.3d 185</u>.

[15]    *See id.*, <u>700 F.3d at 203</u> ("We have summarized considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from [federal firearm licensees]—is consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection.").

constitutional muster."[16]  Plaintiffs' attempt to circumvent *NRA*'s binding holding by tacking on

an attack of the Challenged Laws as applied to 18-to-20-year old young women fares no better;

that challenge is subject to the same controlling framework applied in *NRA*, which requires a

challenged law to be *reasonably*—but not *perfectly*—related to an important government

objective.[17]  Although the gender-agnostic research that this Court found sufficient in *NRA* is

similarly dispositive on Plaintiffs' as-applied challenge, gender-segregated research on suicide,

straw purchases, and domestic violence further bolsters the constitutionality of the Challenged

Laws as applied to all 18-to-20-year-olds, including young women.

## ARGUMENT

The Fifth Circuit, like every Court of Appeals to adopt a post-*Heller* Second

Amendment framework,[18] has endorsed a two-part approach to evaluating Second Amendment

challenges:  First, a court must ask "whether the conduct at issue falls within the scope of the

Second Amendment right"; if not, "the law passes constitutional muster."  *NRA*, 700 F.3d at 194-

95.  Second, and only if the law does impose such a burden, the court applies "the appropriate

level of means-end scrutiny."  *Id.* at 195.  Unless the law "burdens *the core of the Second*

*Amendment* guarantee," it triggers intermediate scrutiny.  *Id.* at 205 (emphasis added).  That

---

[16]    *See id.* at 205, 207 ("Unquestionably, the challenged federal laws trigger nothing more than 'intermediate' scrutiny. . . .  We conclude that the challenged ban passes constitutional muster under 'intermediate' scrutiny.").

[17]    *Id.* at 205.

[18]    *Kolbe* v. *Hogan*, 849 F.3d 114, 132-33 (4th Cir. 2017) (en banc) (listing decisions); *Gould* v. *Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018), *cert. denied*, 141 S. Ct. 108 (2020); *see also Mance* v. *Sessions*, 896 F.3d 390, 391 & n.1 (5th Cir. 2018) (Higginson, J., concurring) ("[T]he panel applied the two-step analytic framework adopted by our circuit and all nine other circuits to have considered the issue."), *denying petition for reh'g en banc*, 880 F.3d 183 (5th Cir. 2018).

requires only "a reasonable fit between the law and an important government objective" and is "easier to justify." *Id.*[19]

The Challenged Laws' public safety purpose, as evidenced by their text and legislative record, and the existence of robust social science to support that purpose, are properly considered at both steps of this analysis. Indeed, the Fifth Circuit relied on these sources in rejecting a nearly identical constitutional challenge to the Challenged Laws in 2012. *See id.* at 207-10. The same analysis and result—which are well reasoned and binding—should govern here.

## I. AT MOST, THE CHALLENGED LAWS' RESTRICTION ON SOME HANDGUN PURCHASES BY 18-TO-20-YEAR-OLDS TRIGGERS INTERMEDIATE SCRUTINY.

As Defendants correctly explain, the historical record concerning age-based firearm restrictions confirms that the Challenged Laws do not implicate Second Amendment rights. (ECF No. 35 (Defs.' Mem.) at 12-24.) On this basis alone, this Court can, and should, grant Defendants' motion at step one of the Fifth Circuit's test.

But even if this Court decides, perhaps out of "an abundance of caution," to "proceed to step two" of the Second Amendment framework, it is "[u]nquestionabl[e]" that "the challenged federal laws trigger nothing more than 'intermediate' scrutiny." *NRA*, 700 F.3d at 204-05. The Fifth Circuit has explained that strict scrutiny is appropriate only where a challenged law "*severely* burdens Second Amendment rights." *United States* v. *McGinnis*, 956

---

[19] The Fifth Circuit's two-step Second Amendment inquiry applies to as-applied, as well as facial, challenges. *See, e.g.*, *Mance* v. *Sessions*, 896 F.3d 699, 704-05 (5th Cir. 2018) (applying two-step inquiry to as-applied Second Amendment challenge to federal firearms restriction). Thus, Plaintiffs' newly raised claim that the Challenged Laws are unconstitutional as applied to 18-to-20-year-old young women (ECF No. 29 (Am. Compl.) at ¶¶ 2-3, 83-90) is subject to the same, well-established, two step framework as their facial challenge.

F.3d 747, 758 (5th Cir. 2020) (emphasis added); *see also NRA*, 700 F.3d at 205 ("A law that burdens the core of the Second Amendment guarantee . . . would trigger strict scrutiny, while a less severe law would be proportionately easier to justify.").  The Challenged Laws do no such thing.

As the Fifth Circuit recognized when it previously upheld the Challenged Laws, these laws ban neither the possession nor the use of firearms by minors under the age of 21. *NRA*, 700 F.3d at 206.  Eighteen-to-twenty-year-olds may receive handguns as gifts and are free to buy them from unlicensed private dealers.  *Id.* at 189-90.  Indeed, the Challenged Laws affect only the commercial sale of handguns to minors under 21 by federally licensed dealers.  *Id.* at 206.  Furthermore, the Challenged Laws' "age qualification has only a temporary effect that ends as soon as the person turns 21."  *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (addressing a state law restricting the right of 18-to-20-year-olds to carry handguns in public).  Such a limited restriction "does not burden the core of the Second Amendment right, and, even if it does, the degree of burden is not severe."  *Id.*  Therefore, at most, intermediate scrutiny applies, requiring that the law is "reasonably adapted to achieve an important government interest."  *Id.*  And, as the legislative history and social science discussed *infra* confirm, the Challenged Laws easily satisfy intermediate scrutiny.  *See NRA*, 700 F.3d at 211 ("Because Congress's intended scheme reasonably fits [its] objective, the ban at bar survives 'intermediate' scrutiny.").

## II.    THE CHALLENGED LAWS EASILY SURVIVE INTERMEDIATE SCRUTINY.

In the Second Amendment context, a court must uphold a law under intermediate scrutiny if there is "'a reasonable fit' between the challenged regulation and an 'important' government objective."  *NRA*, 700 F.3d at 195.  Importantly, "intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government

objective, or that there be no burden whatsoever on the individual right in question," *United States* v. *Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011), and "the fit between the challenged regulation and the asserted objective [should] be reasonable, not perfect," *United States* v. *Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

A court evaluating a law's constitutionality "must accord substantial deference to the predictive judgments of Congress" and is "not at liberty to substitute [its] judgment for the reasonable conclusion of a legislative body." *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195, 212 (1997) (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 665 (1994)); *see also NRA*, 700 F.3d at 210 n.21 (noting that Congress is "entitled to some deference" because it is "far better equipped than the judiciary to make predictive judgments and amass and evaluate the vast amounts of data bearing upon complex and dynamic issues" (internal quotations omitted)). Here, the Challenged Laws pass constitutional muster under intermediate scrutiny.   Both legislative history and social science confirm that the Challenged Laws were a targeted solution to the important government objective of public safety.

A.   **Congress Enacted "Calibrated" Laws to Address the Problem of Handgun Violence by Minors Under the Age of 21.**

The Fifth Circuit has explained that "curbing violent crime perpetrated by young persons under 21 . . . constitutes an important government objective" and that "[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted." *NRA*, 700 F.3d at 209 (internal quotations omitted).   The Challenged Laws' legislative history confirms that Congress had this very public safety interest in mind, acting to aid in the "fight against crime," *not* "to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."  Pub. L. No. 90-618, Title I, § 101, 82 Stat. 1213, 1213-14 (1968).   Indeed, the Challenged Laws are narrow, regulating only: (i) sale (not possession or

gifting); (ii) of handguns (not rifles or shotguns); (iii) by FFLs (not unlicensed sellers); (iv) to minors under the age of 21.[20]  This carefully "calibrated" restriction, *NRA*, 700 F.3d at 209, targeted important problems Congress identified: "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), and the "causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior," Pub. L. No. 90-351, Title IV, § 901(a)(6), 82 Stat. 197, 225-26 (1968).

Specifically, Congress's multi-year investigation, which comprised both "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), uncovered the following facts:

- "[M]inors account for 64 percent of the total arrests" for "serious crimes in the United States."  S. Rep. No. 90-1097, at 77 (1968).

- "[M]inors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence, including murder, rape, robbery, and aggravated assault."  114 Cong. Rec. 12309 (1968) (Sen. Thomas J. Dodd, Chairman, Sen. Subcomm. on Juvenile Delinquency).

- According to federal law enforcement officials, at the time the law was enacted, "[t]he greatest growth of crime" was "in the area of young people, juveniles and young adults," and "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."  *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967) (statement of Sheldon S. Cohen, Commissioner of Internal Revenue).

- Local law enforcement officers from around the country submitted "statistics documenting the misuse of firearms by juveniles and minors," which "[took] on added significance when one considers the fact that in each of the jurisdictions

---

[20]     *See, e.g.*, S. Rep. No. 90-1097, at 79 (1968) ("[A] minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian."); *see also* Bureau of Alcohol, Tobacco, and Firearms Chief Counsel's Opinion 23362 (Dec. 5, 1983) (opining that a dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child as long as the minor is not otherwise prohibited from receiving or possessing a firearm).

. . . the lawful acquisition of concealable firearms by these persons was prohibited by statute," S. Rep. No. 89-1866, at 59 (1966), and in light of the "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities," *id.* at 19.

- "[A]lmost all of these firearms . . . are put into the hands of juveniles [and minors] by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen, Commissioner of Internal Revenue).

- "[E]specially concern[ing]" was "the particular type of weapon that is predominantly used by the criminal": the handgun. S. Rep. No. 89-1866, at 4 (1966). Indeed, the handgun's "size, weight, and compactness make it easy to carry, to conceal, to dispose of, or to transport," and "[a]ll these factors make it the weapon most susceptible to criminal use" by minors. *Id.*[21]

Based on these findings, Congress concluded that concealable firearms "have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," and "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, §§ 901(a)(3), (a)(6), 82 Stat. 197, 225-26 (1968). Though fully aware "that there are some youngsters under the age of 21 who are more mature than others," and that its age restriction "could cause minor inconveniences to certain youngsters

---

[21]      Some of this evidence supports a broader age restriction for all firearms, not just handguns. However, the fact that Congress did "not address all aspects of a problem in one fell swoop" does not make its targeted steps to achieve incremental results in reducing handgun crime unconstitutional. *Mance* v. *Sessions*, 896 F.3d 699, 708 (5th Cir. 2018) (upholding allegedly "underinclusiv[e]" interstate handgun sales restrictions because "policymakers may focus on their most pressing concerns" (internal quotation marks omitted)), *cert. denied*, 141 S. Ct. 123 (2020); *see also N.Y. State Rifle & Pistol Ass'n, Inc.* v. *Cuomo*, 804 F.3d 242, 263 (2d Cir. 2015) ("[G]un-control legislation need not strike at all evils at the same time to be constitutional." (internal quotation marks omitted)).

who are mature, law abiding, and responsible," Congress viewed its chosen compromise as necessary and reasonable due to "crimes of violence by persons under 21 years of age." 114 Cong. Rec. 12309 (Sen. Dodd).

> **B.     Extensive Evidence Confirms that the Challenged Laws Are a Data-Driven Solution to Promote Public Safety by Reducing Gun Violence.**

Neuroscience and social science research confirm Congress's conclusion that 18-to-20-year-olds with easy access to firearms pose a substantial risk to themselves and others. Congress crafted a tailored, limited solution to address that risk.  Courts have relied on such research in rejecting similar or identical challenges, including in this Circuit and the Seventh Circuit, *see NRA*, 700 F.3d at 210 n.21; *Horsley* v. *Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015), and district courts in Washington State and Virginia, *see Mitchell* v. *Atkins*, 483 F. Supp. 3d 985, 995-96 (W.D. Wash. 2020); *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d. 747, 759 (W.D. Va. 2019).

> **1.     Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts.**

The scientific literature shows that the human brain does not finish developing until the mid-to-late twenties.[22]  The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and planning.[23]  The prefrontal cortex

---

[22]     Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[23]     *Id.*; *see also* Kappel Decl., Ex. 1, Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE AND TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions.  These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure.  As a result, people in their late teens and early twenties tend to have lower self-control and to make more impulsive decisions.[24]  Eighteen-to-twenty-year-olds are prone to risk-taking, and they deprioritize long-term outcomes.  *See NRA*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *id.* (quoting submission from the American Medical Association: "The brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is 'one of the last brain regions to mature.'  This, in turn, means that 'response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.'"); *Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." (citation omitted)).

In addition, minors are uniquely prone to negative emotional states.[25]  Adolescents' responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[26]  Scientists have reasoned that "[f]eeling sad, depressed,

---

[24]     Kappel Decl., Ex. 1, Arain, *supra* note 23, at 453 ("[S]tudies involv[ing] comparing a teen brain to an adult brain determined that adolescents' prefrontal cortices are used less often during interpersonal interactions and decision making than their adult counterparts . . . provid[ing] a partial explanation for certain characteristics of adolescents and adolescent behaviors, such as quickness to anger, intense mood swings, and making decisions on the basis of 'gut' feelings.").

[25]     Kappel Decl., Ex. 2, Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[26]     *Id.*

or hopeless may be associated with the heightened rates of affective disorders, attempted and completed suicide, and addiction also observed during adolescence."[27]   Minors are also more likely to *act* on negative emotions like stress or rage, because their limbic systems have matured while their cerebral cortices (*i.e.*, impulse control centers) are still developing.[28]

Because their brains are still developing, 18-to-20-year-olds are at a higher risk of violence when they have unfettered access to firearms.[29]   Indeed, educational institutions serving this age group—such as colleges and military academies, which arguably admit only the most responsible young adults—recognize this risk.  *See, e.g.*, U.S. Military Academy Regulation 190-3 at § II.1-6(b)(1) ("No pistols or handguns may be registered or carried by anyone under the age of twenty-one (21) to include Cadets.") (on file with counsel).[30]   Neuroscience shows that the Challenged Laws were a targeted and reasonable solution to a pressing public safety problem.

---

[27]   *Id.*; *see also* Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES (Jan. 6, 2020), https://www.nytimes.com/2020/01/06/opinion/suicide-young-people.html?action=click& module=Opinion&pgtype=Homepage ("While young people are generally physically healthy, they are psychiatrically vulnerable. Three-quarters of all the mental illness that we see in adults has already occurred by age 25.").

[28]   Kappel Decl., Ex. 1, Arain, *supra* note 23, at 458 ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress.").

[29]   *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures.  Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

[30]   *See also* Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57, 64 (2002) ("[O]ur findings also suggest that students who report having guns at college disproportionately engage in behaviors that put themselves and others at risk for injury.").

     **2.**       **Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms.**

Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides—both as victims and as perpetrators.[31]  The statistics are stark:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[32]

- Though 18-to-20-year-olds make up less than 5% of the population, they account for more than 15% of homicide and manslaughter arrests.[33]

- This general pattern has persisted over time.  The following chart, showing homicide offending rate by age in 2009, vividly illustrates the disproportionate share of homicides committed by minors that year:[34]



---

[31]     Andrew R. Morral et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 145 (2018); *see also People* v. *Fields*, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("[T]he 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

[32]     U.S. Department of Justice, *Crime in the United States*, Arrests by Age, 2019, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.

[33]     *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019, https://www.census.gov/data/datasets/time-series/demo/popest/2010s-national-detail.html.

[34]     Kappel Decl., Ex. 3, Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, Johns Hopkins Ctr. for Gun Policy & Research 1, 5 (2012), https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

- FBI data also suggest that young people are disproportionately convicted of homicides.  For example, 18-to-20-year-olds comprise under 5% of the U.S. population, but account for 17% of known homicide offenders.  And the victims of homicides perpetrated by 18-to-20-year-olds are also disproportionately likely to be under the age of 21 themselves.[35]

Just this spring, a 19-year-old shooter killed eight people and wounded several more before taking his own life at a FedEx facility in Indianapolis.  Several of the deadliest mass school shootings in our nation's history were also committed by someone in the age range targeted by the Challenged Laws: the February 14, 2018 Parkland, Florida shooting at Marjory Stoneman Douglas High School, in which a 19-year-old shooter killed 17 victims; the December 14, 2012 Newtown, Connecticut shooting at Sandy Hook Elementary School, in which a 20-year-old shooter killed 20 schoolchildren, six adult school staff and faculty, and his mother, before turning the gun on himself; and the April 20, 1999 Littleton, Colorado shooting at Columbine High School, in which an 18-year-old and a 17-year-old killed 12 students and one teacher, before dying by suicide.[36]  Within weeks of the 20-year anniversary of the Columbine shooting, and just a few miles away, an 18-year-old and a juvenile killed one of their classmates and injured eight others using a number of weapons, including two handguns.[37]

---

[35]    Calculated using data from the FBI's Supplementary Homicide Reports and US Census Bureau. Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR), Washington, DC: Department of Justice, Federal Bureau of Investigation; US Census Bureau Population Estimates.

[36]    *Police Release Names of 8 Victims in Indianapolis Shooting*, N.Y. TIMES (Apr. 18, 2021), https://www.nytimes.com/live/2021/04/16/us/indianapolis-fedex-shooting;  *Deadliest Mass Shootings in the US Fast Facts*, CNN, https://www.cnn.com/2019/08/19/us/mass-shootings-fast-facts/index.html (last updated Apr. 14, 2021); Evan Perez et al., *What We Know About Dimitrios Pagourtzis, the Alleged Santa Fe High School Shooter*, CNN, https://edition.cnn.com/2018/05/18/us/dimitrios-pagourtzis-santa-fe-suspect/ (last updated May 21, 2018).

[37]    Associated Press, *At Least 2 Handguns Used in School Shooting Near Columbine*, MPR NEWS (May 8, 2019), https://www.mprnews.org/story/2019/05/08/at-least-2-handguns-used-in-school-shooting-near-columbine.

Compounding these tragic statistics is the fact that, even after the shooting stops, gun violence disproportionately harms young people.  Young people exposed to gun violence are at a greater risk of developing PTSD[38] and harming themselves.[39]  For instance, after the Columbine massacre, one student survivor suffering from PTSD died by suicide after losing two friends and watching his basketball coach die in the mass shooting.[40]  Similarly, two teenage survivors of the 2018 mass shooting in Parkland, Florida, later died by suicide.[41]

In the 20 years following the Columbine High School massacre, there were 486 incidents involving firearms at schools and 68 incidents of an active shooter on school property during the school day.[42]  And school shootings have only become more frequent:  "From 1999 to 2014, the average number of days between [active school] shootings was 124 days.  From 2015 to 2018, the average was 77 days."[43]  Mass shooters tend to target people or institutions against

---

[38]   One study found that nearly 40% of children exposed to a shooting will develop PTSD. *See* Eboni Morris, Nat'l Urb. League Pol'y Inst., Youth Violence: Implications for Posttraumatic Stress Disorder in Urban Youth 7 (2009).

[39]   Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*, Huffington Post (Sept. 24, 2012), https://www.huffingtonpost.com/glenn-d-braunstein-md/children ptsd_b_1901651.html.

[40]   *Id.*

[41]   Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, Pac. Standard (Mar. 25, 2019), https://psmag.com/education/the-psychological-aftermath-of-surviving-school-shootings.

[42]   Luis Melgar, *Are School Shootings Becoming More Frequent?  We Ran the Numbers*, Ctr. for Homeland Defense & Security (May 21, 2019), https://www.chds.us/ssdb/are-school-shootings-becoming-more-frequent-we-ran-the-numbers/.

[43]   *Id.*

which they have a grievance,[44] which explains why most school shooters—as high as 91% in one

recent study—were current or former students of the school at which the attack occurred.[45]

Furthermore, semiautomatic handguns are especially common in mass shootings.  In a study of

189 mass shootings, 9mm semiautomatic handguns were the most commonly used weapons,

including by the student who killed 32 people at Virginia Tech in 2007.[46]  Another study found

that 81% of mass shootings involved the use of at least one handgun, and that 60% involved only

handguns.[47]

    Plaintiffs—implicitly acknowledging the relevance of social science to this

Court's analysis at step two—argue that the Challenged Laws are unconstitutional, at least as

applied to 18-to-20-year-old female minors, because male minors in this age group are arrested

for homicides and violent crimes more frequently than women in this age group.  (ECF No. 29

(Am. Compl.) at ¶¶ 85-86.)  Even assuming the propriety of Plaintiffs' contrived, gender-based

line-drawing, Plaintiffs fail to explain why they compare the crime rates of 18-to-20-year-old

female minors to those of 18-to-20-year-old *male* minors, as opposed to those of women in other

---

[44] A comprehensive analysis of mass shootings shows that about "70% of mass shooters knew at least some of their victims," and school shooters "in particular were 'insiders.'"  Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the United States*, THE VIOLENCE PROJECT 19 (Nov. 2019), https://www.theviolenceproject.org/wp-content/uploads/2019/11/TVP-Mass-Shooter-Database-Report-Final-compressed.pdf.

[45] Jillian Peterson & James Densley, *School Shooters Usually Show These Signs of Distress Long Before They Open Fire, Our Database Shows*, THE CONVERSATION (Feb. 8, 2019), https://theconversation.com/school-shooters-usually-show-these-signs-of-distress-long-before-they-open-fire-our-database-shows-111242.

[46] Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/ (last updated May 10, 2021).

[47] *Mass Shootings in America*, Everytown Rsch. & Pol'y (Apr. 14, 2021), https://everytownresearch.org/maps/mass-shootings-in-america-2009-2019/.

-16-

age demographics.  And indeed, Plaintiffs provide no data purporting to show that female minors aged 18 to 20 are less likely to be involved in crime than older women.  Plaintiffs also entirely disregard social science research on suicide and firearms, presenting no data establishing that 18-to-20-year-old female minors attempt suicide less frequently than older women.[48]  But more fundamentally, the gender neutral research that the Fifth Circuit already found sufficient in *NRA* provides ample justification for applying the Challenged Laws against *all* 18-to-20-year-olds on the basis that young adults are in a volatile state compared to older adults, which makes them more likely to use firearms impulsively or recklessly.  700 F.3d at 210 n.21; *supra* pp. 10-12.  Impulsive use of firearms is not limited to using firearms in violent crimes, but could include actions like engaging in "straw purchasing" of guns to facilitate illegal activity by others.[49]  Critically, intermediate scrutiny requires a "reasonable"—not perfect—fit.  *NRA*, 700 F.3d at 195.  Courts have held in the context of as-applied Second Amendment challenges that the fact a law may be "somewhat over-inclusive given that not every person who falls within" the law's restrictions would use a firearm for violent ends, "does not undermine the constitutionality of [the challenged law] . . . because it merely suggests that the fit is not a perfect one; a reasonable fit is all that is required under intermediate scrutiny."  *United States* v. *Chapman*, 666 F.3d 220, 231 (4th Cir. 2012); *see also United States* v. *Staten*, 666 F.3d 154, 167-68 (4th Cir. 2011).

---

[48]    In fact, 18-to-20-year-old women attempt suicide at 1.63 times the rate of 21-to-24-year-old women.  Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Nonfatal Injury Report, 2015-2019*, https://webappa.cdc.gov/sasweb/ncipc/nfirates.html.

[49]    Indeed, there is evidence that women may be disproportionately involved in "straw purchases" of firearms, *i.e.*, purchasing a firearm for another individual who is legally prohibited from possessing a firearm.  Straw purchasers are "often friends (45%), relatives (23%), and spouses or girlfriends (25 percent)" of the person illegally diverting the firearm.  Bureau of Alcohol Tobacco and Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* 18 (June 2000).

Congress is not, and should not, be required to tailor laws so precisely that they may run afoul of the Equal Protection clause of the U.S. Constitution.[50]   Neuroscience research showing that minors under 21 are more likely to handle firearms dangerously and impulsively supplies an adequate justification for restricting firearm access by all minors under 21.[51]

> **3.    Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.**

Eighteen-to-twenty-year-olds are also disproportionately at risk of attempting suicide, and firearm access exacerbates this risk.   Many major psychiatric conditions first develop in adolescence,[52] and "suicide risk increase[s] steeply during the first few years after [an

---

[50]    *See* ECF No. 35 (Defs.' Mem.) at 26 n.12; *see also United States* v. *Virginia*, 518 U.S. 515, 531 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."); *Bolling* v. *Sharpe*, 347 U.S. 497, 500 (1954) (holding that the Constitution imposes on the Federal Government an equal antidiscrimination duty to that of the States).

[51]    Even were the Court inclined to consider gender segregated research in evaluating Plaintiffs' as-applied challenge—which the governing legal framework does not require and the Equal Protection Clause may not approve—there is ample research supporting the Challenged Laws as applied to young women.   As explained above, the rate of suicide attempts by 18-to-20-year-olds is over 50% higher than the rate of suicide attempts by 21-to-24-year-old women.   Centers for Disease Control and Prevention, *Nonfatal Injury Report*, *supra* note 48.   Moreover, there is evidence that the presence of a firearm in the home may make women who experience domestic violence more prone to lethal abuse—regardless of who in the home purchased the firearm.   Susan B. Sorenson & Douglas J. Wiebe, *Weapons in the Lives of Battered Women*, 94 AM. J. PUB. HEALTH 1412 (2004) (study of women staying in emergency battered women shelters finding that in two-thirds of the households in which the battered woman had a firearm in the home, "the intimate partner used the gun(s) against the woman, usually threatening to shoot/kill her (71.4%) or to shoot at her (5.1%)").   Finally, as noted, women may be disproportionately involved in "straw purchasing" firearms for peers or partners who are legally prohibited from possessing a firearm.   *See* Bureau of Alcohol Tobacco and Firearms, *Following the Gun*, *supra* note 49.   These and other firearm-related risks that are unique to women justify the Challenged Laws if the Court believes gender-segregated data are necessary.

[52]    Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVIEWS NEUROSCIENCE 947, 952 (2008) ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis (including schizophrenia) and substance abuse all most

individual's] first contact with psychiatric services."[53]    Furthermore, 18-to-20-year-olds'

impulsivity and propensity toward negative emotional states, discussed in Section II.B.1, *supra*,

puts them at particular risk of suicide, which "is commonly an impulsive act by a vulnerable

individual."[54]   One study found that of 153 survivors of nearly lethal suicide attempts aged 13-to-

34, close to a quarter reported that *less than five minutes* passed between their decision to attempt

suicide and their attempt.[55]   Another study asked people who were referred to a psychiatric

hospital following a suicide attempt how much time passed between when they first began

contemplating the act and their attempt; 47.6% stated that ten minutes or less had passed.[56]

Thus, it is troubling, yet unsurprising, that suicide accounts for a higher percentage of deaths for

---

commonly emerge during adolescence."); *Mental Health Disorder Statistics*, JOHNS HOPKINS
MEDICINE,      https://www.hopkinsmedicine.org/health/wellness-and-prevention/mental-health-
disorder-statistics (explaining that schizophrenia typically "first appears in men during their late
teens or early 20s").

[53]     Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES OF GENERAL PSYCHIATRY 1058, 1061 (2011).

[54]     E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[55]     Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49, 50–52 (2001).

[56]     Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19, 20 (2009).

15-to-24-year-olds than for any other age group.[57]   Indeed, from 2010 to 2019, suicide was the second-most-common cause of death among 18-to-20-year-olds.[58]

Stemming from the rapidity with which suicidal ideation gives way to action, "[a]ccess to firearms is a key risk factor for suicide."[59]   In fact, "at least a dozen U.S. case-control studies in the peer-reviewed literature . . . have found that a gun in the home is associated with an increased risk of suicide.  The increase in risk is large, typically 2 to 10 times that in homes without guns . . . ."[60]

Those prone to "act impulsively . . . are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[61]   Given the increased risk of suicide posed by firearm access, and the inherent lethality of firearms, firearm suicide is the suicide method with the highest fatality rate—the odds of completing a suicide attempt are 140

---

[57]     Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981-2019*, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[58]     *Id.* Centers for Disease Control and Prevention has not reported cause of death statistics post-dating 2019.

[59]     American Public Health Association, *Reducing Suicides by Firearms* (Nov. 13, 2018), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

[60]     Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 N. ENGL. J. MED. 989, 990 (2008); *see also* Matthew Miller & David Hemenway, *Firearm Prevalence and the Risk of Suicide:  A Review*, 2 HARV. HEALTH POL'Y REV. 29, 34 (2001) ("Case-control studies provide strong evidence that suicide risk is heightened where guns are more readily available.").

[61]     Miller & Hemenway, *Firearm Prevalence and the Risk of Suicide*, *supra* note 60, at 34.

times greater when a gun is used than for any other commonly used method.[62]   Framed differently, while 4% of non-firearm suicide attempts are fatal,[63] 85% of suicide attempts with a gun are fatal.[64]

Preventing access to firearms can save lives from suicide because research shows that fewer than 3% of people who survive one suicide attempt later die by suicide.[65]   But as scholars have noted, although "[s]uicide attempters often have second thoughts, . . . when a method like a gun works so effectively, there's no opportunity to reconsider."[66]   A young adult's access to firearms when contemplating a suicide attempt, therefore, often determines whether they die or recover.

      **4.**    **Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors.**

Studies also show that there is a "reasonable fit" between the Challenged Laws and Congress's public safety objective.  *NRA*, <u>700 F.3d at 207</u>.  Studies have found a connection between age restrictions like the Challenged Laws and a decline in firearm-related adolescent

---

[62]    J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1097 (2016).

[63]    Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012) (establishing that in 2001, there were 333,765 non-firearm suicide attempts and 13,753 fatalities).

[64]    *Id.* (establishing that in 2001, there were 19,849 firearm suicide attempts and 16,869 fatalities).

[65]    Bostwick, *supra* note 62, at 1098.

[66]    Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016),   https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

deaths, especially suicides and unintentional shootings.[67]   For instance, an August 2004 study found that state laws raising the minimum age for handgun purchases to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[68]   A survey of convicted gun offenders in 13 states found that a minimum legal age of 21 would have prohibited 17% of the offenders from obtaining firearms at the time of their crimes, a finding that "underscore[d] the importance of minimum-age restrictions."[69]

Research also confirms that federal minimum-age restrictions reduce youth suicide and unintentional deaths, and may be even more effective than state minimum-age restrictions.[70]   According to a 2014 study, after Congress raised the minimum age for handgun possession to 18 in 1994, youth suicide rates dropped by 1.2 per 100,000 persons—decreasing from approximately 2.1 suicides per 100,000 in 1994 to 0.9 suicides per 100,000 in 2010.[71]   The decline in youth unintentional firearm death rates was also dramatic: in 1994, the rate of youth unintentional gun deaths was approximately 0.67 per 100,000 persons, but after the federal

---

[67]   The same concerns regarding minors' heightened impulsiveness led to passage of laws in all 50 states establishing 21 as the minimum legal age for alcoholic beverage consumption. Studies confirm that these laws led to significant reductions in death from motor vehicle crashes involving minor drivers. William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, (SUPP.) 17 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014).

[68]   Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

[69]   Kappel Decl., Ex. 4, Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29-30 (2013).

[70]   Kappel Decl., Ex. 5, Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 SOC. SCI. J. 168, 173 (2015).

[71]   *Id.* at 173-74.

minimum-age law was enacted in 1994, the rate fell to approximately 0.2 per 100,000 persons for a total decrease of 0.47 per 100,000 persons.[72]

In addition to studies confirming the specific efficacy of minimum-age laws, studies also show that gun violence prevention laws generally reduce gun violence among young people, including in the 18-to-20-year-old range.  An August 2019 study examined the 21,241 firearm-related deaths among U.S. children from 2011 to 2015.  Eighteen-to-twenty-one-year-olds made up more than half of these deaths (68.7%).  But gun violence prevention efforts made a difference: using a point system to measure the strength of each state's gun laws, the study found that every 10-point increase in the strength of a state's gun laws "decrease[d] the firearm-related mortality rate in children by 4%" in its fully adjusted model.[73]  Another study, using the same gun-law scores and published in August 2019, found that the quartile of states with the strongest laws "have an annual pediatric firearm mortality rate of 2.563 per 100,000 [children aged 0 to 19 years old] compared with states in the lowest quartile [with the least strict laws], where the mortality rate is almost twice as high at 5.005 per 100,000."[74]

Finally, research demonstrates that most mass shooters obtain their weapons lawfully.  In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[75] indicating that these

---

[72]     *Id.*

[73]     Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2, at 3 & tbl. 1 (2019).

[74]     Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLLEGE SURGEONS 150, 152 (2019).

[75]     U.S. Department of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018),

perpetrators seek easy firearm access and are not necessarily sophisticated participants in the black market for guns.  Lawmakers therefore can and should assume that restricting access to firearms will deter criminal use of firearms—precisely the type of reasonable assumption that underlies virtually all laws regulating dangerous products.  *Cf., e.g.*, *Nat'l Paint & Coatings Ass'n* v. *City of Chicago*, 45 F.3d 1124, 1128 (7th Cir. 1995) ("Legislatures often enact laws that reduce but cannot eliminate the effects of movements across municipal and state borders.").

## **CONCLUSION**

For the foregoing reasons and those set forth by the Government, the longstanding federal laws Plaintiffs challenge do not implicate the Second Amendment, and even if they did, easily survive the appropriate level of scrutiny.  The Challenged Laws represent Congress's careful and considered solution to a grave public safety concern.  In the decades since the Challenged Laws were enacted, neuroscience and social science have further confirmed that the problem Congress identified—minors under the age of 21 with easy access to firearms—was substantial, and Congress's tailored solution was and is effective, a conclusion the Fifth Circuit embraced in upholding the Challenged Laws from a nearly identical attack in 2012.  Plaintiffs nevertheless urge this Court to overrule both Congress's considered judgment and binding Fifth Circuit precedent by declaring the Challenged Laws unconstitutional.  Nothing in the Second Amendment requires that result.

---

https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

Dated:  June 3, 2021

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence:*

Hannah Shearer
Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA  94104
(415) 433-2062

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY  10018
(917) 680-3473

Robert A. Sacks
Leonid Traps
D. Wil Gould
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498
(212) 558-4000

Angela N. Ellis
Rachel H. VanGelder
Madeline B. Jenks
Alexander L. Minore
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC  20006
(202) 956-7500

Respectfully submitted,

/s/ *Timothy R.W. Kappel*
Timothy R.W. Kappel (Bar No. 32881)
WELLS & KAPPEL LLP
1615 Poydras Street, Suite 900
New Orleans, Louisiana  70112
(504) 905-2012
tkappel@wellskappel.com

*Counsel of Record for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence*