## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CALEB REESE** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 6:20-cv-01438 |
| | : | |
| **THE BUREAU OF ALCOHOL, TOBACCO,** | : | |
| **FIREARMS AND EXPLOSIVES** *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................1

BACKGROUND ...............................................................................................................3

I.     Regulatory Background ...........................................................................................3

II.    Factual and Procedural Background ........................................................................4

ARGUMENT ...................................................................................................................6

I.     Standards of Review ...............................................................................................6

II.    The Court Has Article III Jurisdiction Over This Matter. ....................................6

      A.    The Individual Plaintiffs Have Article III Standing. ..............................6

      B.    The Organizational Plaintiffs Have Article III Standing. ......................7

III.   The Second Amendment Does Not Permit the Government to Prohibit
18-to-20-Year-Olds From Purchasing Handguns From Licensed Retailers.......................8

      A.    The Appropriate Standard for Evaluating the Constitutionality of Laws
Burdening Conduct Protected by the Second Amendment Is Based in
Text, History, and Tradition. ..................................................................8

      B.    The Government Has Failed to Offer Any Additional Support for the
Fifth Circuit's Erroneous Determination In *NRA I*. ...............................13

      C.    The Handgun Ban Is Facially Unconstitutional Under Any Heightened
Standard of Review. ................................................................................17

IV.   The Court Should Grant Summary Judgment in Favor of Plaintiff Naquin's and the
Organizational Plaintiffs' As-Applied Challenge to the Handgun Ban...........................18

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) ....................................22

*Binderup v. Atty. Gen.*, 836 F.3d 336 (3d Cir. 2016)................................................................23, 24

*Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295 (5th Cir. 2014) ........................................6

*Craig v. Boren*, 429 U.S. 190 (1976)...................................................................................... 21, 24

*Ctr. for Biological Diversity v. EPA*, 937 F.3d 533 (5th Cir. 2019)...............................................7

*Denton Cnty. Elec. Coop., Inc. v. Nat'l Labor Relations Bd.*,
   962 F.3d 161 (5th Cir. 2020) ....................................................................................................24

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................ *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................................8, 9

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ...........................................................................9

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ..................................................................................23

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011).............9, 11, 12, 13

*In re Cao*, 619 F.3d 410 (5th Cir. 2010) ......................................................................................22

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ....................................................................22

*Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018) ..........................................................................9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)...................................................... 1, 8, 19, 23

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020)..............................17

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,
   & Explosives* ("*NRA I*"), 700 F.3d 185 (5th Cir. 2012) ............................................... *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,
   & Explosives* ("*NRA II*"), 714 F.3d 334 (5th Cir. 2013).............................................. *passim*

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020)......................................................................................9

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991)................................................................................................................. 13

*Stratta v. Roe*, 961 F.3d 340 (5th Cir. 2020)................................................................................. 6

*Tex. Assoc. of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ............................................................8

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) ...........................................9

*United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993) ...............................................22, 23

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).............................................................16

*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) ...................................... 10, 22

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ...........................................9

## Constitutions, Statutes, and Rules

18 U.S.C.
§ 922(a)(1)(A) .........................................................................................4
§ 922(a)(3) ..............................................................................................2
§ 922(b)(1) ..........................................................................................1, 3
§ 922(c)(1) ...........................................................................................1, 3
§ 922(t)....................................................................................................2

27 C.F.R.
§ 478.96(b) .............................................................................................3
§ 478.99(b)(1) .........................................................................................3
§ 478.124(a) ............................................................................................3
§ 478.124(f)..............................................................................................3

Fed. R. Civ. P.
12(b)(1) ..................................................................................................6
12(b)(6) ..................................................................................................6

## Legislative Materials

*Federal Firearms Act: Hearings on S. 1, Amendment 90 to s. 1, S. 1853, and S. 1854 Before the
Subcomm. To Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*
("*Hearing*"), 90th Cong., 1st Sess. 44 (Comm. Print 1967)..................................18, 19, 20

Omnibus Crime Control and Safe Streets Act of 1968 ("Act"),
Pub. L. No. 90-351, 82 Stat. 197 ...........................................................................3, 17

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112.......................................17, 18

## Other Authorities

Bureau of Just. Statistics, *Homicide Trends in the United States, 1980*-2008,
Table 11: Homicides, by intimate relationship and type of weapon, 1980-2008,
U.S. Dep't of Just. (November 2011), https://bit.ly/3gcSosa ...........................................21

Gary Kleck, *Regulating Guns Among Young Adults*, 44 AM. J. OF CRIM. JUST. 689 (Apr. 29, 2019)............................................................................................................. 17

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (Fall 1995), https://bit.ly/2ROM2Gk ..............................................................................21

Inge Anna Larish, *Why Annie Can't Get Her Gun: A Feminist Perspective on the Second Amendment*, 1996 U. ILL. L. REV. 467, 494 n.213 (1996) ........................................... 20, 21

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gpBXYw (June 15, 2021)...........25

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: Females*, U.S. DEP'T OF JUST., https://bit.ly/3zmorNV (June 15, 2021) ...25

Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., https://bit.ly/3zmorNV (June 15, 2021) ..........................................................................19

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: Males*, U.S. DEP'T OF JUST., https://bit.ly/3gtPG0i (June 15, 2021)..........25

Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Males*, U.S. DEP'T OF JUST., https://bit.ly/3gtPG0i (June 15, 2021) ............................................................................ 19

Hans Toch & Alan J. Lizotte, *Research and Policy: The Case of Gun Control*, in PSYCH. AND SOC. POL'Y (Peter Suedfeld & Philip E. Tetlock 1st ed. 1992)....................21

## INTRODUCTION

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). The Individual Plaintiffs in this case are adults between the ages of 18 and 21. They may vote, enter contracts, and marry. They are eligible to serve in the military. And yet, under 18 U.S.C. §§ 922(b)(1) & (c)(1) and its implementing regulations (collectively "the Handgun Ban"), they are entirely excluded from the commercial market for handguns. This is so even though (a) at the time the Second Amendment was adopted, 18-year-old men were universally understood to be members of the militia not just allowed but generally *required* to possess firearms, and (b) the handguns 18-to-20-year-olds are prohibited from purchasing are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 628–29). Although the Government claims that this measure is justified by a concern over violent crime and reducing easy and anonymous access to firearms, no level of scrutiny is appropriate for assessing the Handgun Ban—Plaintiffs have a constitutional right to purchase handguns, and that "necessarily takes [this] policy choice[] off the table." *Heller*, 554 U.S. at 636.

Even if some level of scrutiny were appropriate—and even if that level should be intermediate scrutiny—the Handgun Ban still must be invalidated. The Government offers several interests in support of the Ban. First and foremost, the Government says its purpose is to cut violent crime, Mem. In Support of Defs.' Mot. To Dismiss Pls.' Am. Compl. or For Summ. J., Doc. 33-1 at 3 (May 27, 2021) ("Govt. Br."), but 50 years of data and experience shows the Ban has not lowered the rate at which 18-to-20-year-olds commit violent crime. The Government also suggests the law is necessary to prevent individuals from crossing state lines to buy handguns in states with

1

less restrictive gun laws and to prevent anyone too young to legally possess firearms from buying them, Govt. Br. 3, 15, but federal law separately prohibits anyone who is not a federal firearm licensee ("FFL") from purchasing a handgun outside his or her state of residence, *see* 18 U.S.C. § 922(a)(3), and Plaintiffs are not too young to legally possess firearms under state law. Finally, the Government suggests that the law is necessary to curb "clandestine acquisition of firearms," Govt. Br. 4 (citation omitted), but this is where the relationship between the Government's objectives and its means becomes downright bizarre. By forcing 18-to-20-year-olds out of the highly regulated commercial market for guns, where, for example, pre-sale background checks are required, *see* 18 U.S.C. § 922(t), the effect of the Ban is to guarantee that 18-to-20-year-olds who acquire handguns will do so *without that scrutiny*, on an unregulated secondary market.

Despite the lack of *any* justification for this intrusion into Second Amendment rights, the Fifth Circuit has held that the Handgun Ban is facially constitutional, and Plaintiffs concede that this Court must dismiss that claim.

Plaintiffs' claim that the Ban is unconstitutional as applied to women, however, is not foreclosed by circuit precedent. And if the Ban's relationship to the Government's objectives in enforcing it against the entire 18-to-20-year-old population is bizarre, as applied to women, it is perverse. Compared to the general population, 18-to-20-year-old women are disproportionately unlikely to *commit* violent crimes and disproportionately likely to be *victims* of violent crime. Banning these women from handguns that could protect them from a violent attacker makes no sense at all—and is unconstitutional even under Fifth Circuit precedent.

The Government's arguments to the contrary lack merit. Its primary submission is that the Fifth Circuit's ruling that the Ban is facially constitutional somehow forecloses Plaintiffs' as-applied claims, but that is not so. Although the Government complains that the statute need not

satisfy a means-ends scrutiny for possible subsets of the general population to which it applies, that is precisely the function of an as-applied challenge.

For these reasons, while the Court is bound to dismiss Plaintiffs' facial claim, it should grant summary judgment to Plaintiffs on the as-applied claim.

## BACKGROUND

### I.     Regulatory Background

Plaintiffs challenge the constitutionality of statutes that were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968 ("Act"), Pub. L. No. 90-351, 82 Stat. 197, along with regulations promulgated to enforce those statutory provisions, that together bar 18-to-20-year-olds from purchasing handguns from federal firearms licensees ("FFLs"). In particular, the Act makes it unlawful for an FFL:

> to sell or deliver . . . any firearm or ammunition . . . if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1). Likewise, the Act prohibits FFLs from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age." *Id.* § 922(c)(1). These statutes are implemented by regulations that similarly restrict handgun sales to individuals over 21. *See* 27 C.F.R. §§ 478.99(b)(1), 478.96(b), & 478.124(a), (f).

As a result of these statutes and regulations, "18-to-20-year-olds may not purchase handguns from FFLs." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA I*"), 700 F.3d 185, 190 (5th Cir. 2012). And FFLs effectively *are* the market for handguns—all who "engage in the business of importing, manufacturing, or dealing in firearms"

3

must become FFLs. *See* 18 U.S.C. § 922(a)(1)(A). The Handgun Ban therefore shuts 18-to-20-year-olds out of the entire commercial market for handguns.

## II.     Factual and Procedural Background

Plaintiffs Caleb Reese and Emily Naquin (collectively, "Individual Plaintiffs") are residents of Louisiana who are older than 18 but younger than 21 years old. First Am. Compl. Doc. 29 ¶¶ 6–8 (May 5, 2021) ("FAC"); Statement of Undisputed Material Facts In Support of Plaintiffs' Cross-Motion for Summary Judgment ("SOMF") ¶ 1; Naquin Decl. ¶ 1, App. 1. Each of the Individual Plaintiffs "has never been charged with nor convicted of any misdemeanor or felony offense, and is otherwise eligible to purchase and possess firearms, including handguns, under all applicable laws." FAC ¶¶ 19–24, 29; SOMF ¶ 1; Naquin Decl. ¶ 3, App. 1. Neither owns a handgun but both intend and desire to purchase one, along with handgun ammunition, for lawful purposes, including self-defense. FAC ¶¶ 19–20, 24–25, 29–30; SOMF ¶ 2; Naquin Decl. ¶ 5, App. 1–2. Both are "acquainted with the proper and safe handling, use, and storage of handguns and handgun ammunition." FAC ¶¶ 21, 26, 31; SOMF ¶ 2; Naquin Decl. ¶ 4, App. 1. And both "would purchase [one or more handguns] and handgun ammunition from a lawful retailer," given that, if not for the Handgun Ban, the handguns would be "otherwise available for [their] purchase from multiple firearms retailers within [their] local area[s]." FAC ¶¶ 23, 28, 33; SOMF ¶ 3; *see, e.g.,* Combs Decl. ¶ 7, App. 4. However, the Handgun Ban prevents each of them "from purchasing handguns of the makes and models of [their] choice . . . from lawful retailers." FAC ¶¶ 22, 26, 31; SOMF ¶ 3; Naquin Decl. ¶ 5, App. 1–2.

Plaintiffs Firearms Policy Coalition ("FPC"), Second Amendment Foundation ("SAF"), and Louisiana Shooting Association ("LSA") (collectively, "Organizational Plaintiffs") are nonprofit organizations dedicated to promoting the right to keep and bear arms. FAC ¶¶ 9–11;

SOMF ¶ 4; Combs Decl. ¶ 3, App. 3; Gottlieb Decl. ¶ 3, App. 5; Hunt Decl. ¶ 3, App. 7–8. All three Organizational Plaintiffs have members between the ages of eighteen and twenty-one, FAC ¶¶ 9–11; SOMF ¶ 4; Combs Decl. ¶ 4, App. 3; Gottlieb Decl. ¶ 4, App. 5; Hunt Decl. ¶ 4, App. 8, including the Individual Plaintiffs, FAC ¶¶ 6–8; SOMF ¶ 6; Combs Decl. ¶ 5, App. 4; Gottlieb Decl. ¶ 5, App. 6; Hunt Decl. ¶ 5, App. 8, and they all bring this action "on behalf of [their] individual members who would purchase handguns and handgun ammunition from lawful retailers, and [their] member FFL handgun retailers who would sell handguns and handgun ammunition to adults under the age of twenty-one, but are prohibited from doing so by the Handgun Ban," FAC ¶¶ 9–11; SOMF ¶¶ 4–5; Combs Decl. ¶¶ 6–8, App. 4; Gottlieb Decl. ¶¶ 6–8, App. 6; Hunt Decl. ¶¶ 6–8, App. 8.

Plaintiffs initiated this action on November 6, 2020, filing a complaint for declaratory and injunctive relief from the federal agency—the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATF")—and federal officials—Acting Director of BATF Regina Lombardo and Attorney General Merrick Garland—responsible for enforcing the Handgun Ban. Plaintiffs alleged that the Handgun Ban was facially unconstitutional for all adults over the age of eighteen.

On April 15, 2021, the Defendants filed a motion to dismiss or for summary judgment. *See* Defs.' Mot. to Dismiss or for Summ. J., Doc. 19 (Apr. 15, 2021), withdrawn (May 10, 2021). On May 5, 2021, Plaintiffs filed their First Amended Complaint, which added Plaintiff Naquin as a party and added a claim that the Handgun Ban is unconstitutional as-applied to women over the age of eighteen.[1] On May 27, Defendants filed a new motion to dismiss or for summary judgment.

---

[1] The Amended Complaint also added individual-capacity claims against Defendants for nominal damages, but Plaintiffs do not contest dismissal of those claims.

# ARGUMENT

## I.      Standards of Review

The Government has moved to dismiss Counts I and II for failure to state a claim and lack

of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1) & (b)(6). In evaluating the

Government's motion to dismiss, the court must "take the well-pled factual allegations of the

complaint as true and view them in the light most favorable to the plaintiff." *Stratta v. Roe*, 961

F.3d 340, 349 (5th Cir. 2020) (quotations omitted).

The Government has also moved for summary judgment on the merits on both counts and

Plaintiffs have cross-moved for the same on Count II. "Summary judgment is warranted if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

law." *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 297–98 (5th Cir. 2014) (cleaned up).

"When parties file cross-motions for summary judgment, [the Court] review[s] each party's motion

independently, viewing the evidence and inferences in the light most favorable to the nonmoving

party." *Id.* at 298 (quotations omitted).

## II.     The Court Has Article III Jurisdiction Over This Matter.

"The parties seeking access to federal court bear the burden of establishing their standing."

*NRA I*, 700 F.3d at 190–91. "The irreducible constitutional minimum of standing" requires "a

concrete and particularized invasion of a legally protected interest," that is "fairly traceable to the

challenged action of the defendant," and a likelihood "that the injury will be redressed by a

favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))

(cleaned up).

### A.      The Individual Plaintiffs Have Article III Standing.

The Government argues the Individual Plaintiffs lack standing because they have forgone

"a legally-available option to redress their sole alleged injury" by not acquiring a handgun through a gift or some other legally acceptable way, although it concedes that this same argument was rejected by the Fifth Circuit in *NRA I*. Govt. Br. 6 & n.4. Even if binding precedent did not foreclose this argument, it would still fail. The injury Plaintiffs have alleged is not an inability to acquire or possess a handgun, it is an inability to purchase one legally from an FFL. *NRA I*, 700 F.3d at 191–92 (citing *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750–57, 755 n.12); *see* Naquin Decl. ¶ 6, App. 2. That injury gives rise to standing.

### B. The Organizational Plaintiffs Have Article III Standing.

The court need not address the standing of Organizational Plaintiffs, because standing is satisfied "by the presence of at least one individual plaintiff who has demonstrated standing to assert the contested rights as his own." *NRA I*, 700 F.3d at 192 (cleaned up). Even so, Organizational Plaintiffs have associational standing.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). The Government argues the Organizational Plaintiffs have failed the first part of this test for the same reasons it suggests the Individual Plaintiffs lack standing, but as discussed above, this argument was considered and rejected by the Fifth Circuit in *NRA I*.

The Government also takes issue with the allegation that a "second category of members— licensed firearms dealers" suffered a concrete and particularized injury. Govt. Br. 8. Plaintiffs have alleged that those members have lost sales they would otherwise have made to 18-to-20-year-old purchasers if such sales were not prohibited. FAC ¶ 77; *see also, e.g.*, Combs Decl. ¶ 7, App. 6.

7

Although this allegation is not necessary to establish standing for Organizational Plaintiffs, lost sales by members are concrete injuries, fairly traceable to the Handgun Ban, that give rise to standing for the Organizational Plaintiffs. *See Tex. Assoc. of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 378 (5th Cir. 2021).

III.   **The Second Amendment Does Not Permit the Government to Prohibit 18-to-20-Year-Olds From Purchasing Handguns From Licensed Retailers.**

A.   **The Appropriate Standard for Evaluating the Constitutionality of Laws Burdening Conduct Protected by the Second Amendment Is Based in Text, History, and Tradition.**

The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "[O]n the basis of both text and history," the Supreme Court held in *Heller*, the Amendment confers "an individual right to keep and bear arms." 554 U.S. at 595. The Court later reaffirmed in *McDonald* that this guarantee was considered "among those fundamental rights necessary to our system of ordered liberty." 561 U.S. at 778.

In both *Heller* and *McDonald*, the Court "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *Id.* at 785 (plurality opinion); *see also Heller*, 554 U.S. at 634. Instead, the Court in *Heller* looked to three factors when assessing the constitutionality of the District of Columbia's handgun and operable firearm bans. First, the Court paid careful attention to the text of the Second Amendment, particularly the relation between its prefatory and operative clauses. *See* 554 U.S. at 576–600. Second, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," the Court considered historical evidence of the original public meaning of the Second Amendment. *Id.* at 634–35; *see also Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) ("*Heller* focused almost exclusively on the original public meaning of the

Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification."); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 710 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment) ("What determines the scope of the right to bear arms are the 'historical justifications' that gave birth to it. . . . Tiers of review have nothing to do with it." (quoting *Heller*, 554 U.S. at 635)). And third, the Court considered tradition in the form of post-ratification history because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *see also Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017) (explaining that *Heller* reached its conclusion "through a parade of early English, Founding-era, antebellum, and late-nineteenth century cases and commentaries"). To the extent post-ratification traditions are inconsistent with the original understanding, however, the original understanding controls. *See Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Thus, as at least seven current Fifth Circuit judges, and one Supreme Court justice, have recognized, "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Mance v. Sessions*, 896 F.3d 390, 395 (5th Cir. 2018) (en banc) (Elrod, J., dissental, joined by Jones, Smith, Willett, Ho, Duncan, & Engelhardt, JJ.); *accord Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting); *see also Rogers v. Grewal*, 140 S. Ct. 1865, 1866 (2020) (Thomas, J., dissenting from the denial of certiorari, joined by Kavanaugh, J.) ("Consistent with [*Heller*'s] guidance, many jurists have concluded that text, history, and tradition are dispositive in determining whether a challenged law violates the right to keep and bear arms.").

Nevertheless, contrary to the clear lessons from *Heller* and *McDonald*, in *NRA I* the Fifth Circuit adopted a two-step approach in which "the first step is to determine whether . . . the [challenged] law regulates conduct that falls within the scope of the Second Amendment's guarantee" and "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." 700 F.3d at 194. The *NRA I* framework, which remains the binding law of the Circuit, *see United States v. McGinnis*, 956 F.3d 747, 753 n.3 (5th Cir. 2020), has no foundation in *Heller*, in *McDonald*, in the text and original understanding of the Second Amendment, or in the American tradition. While this Court is bound to apply it, it should be overruled by the en banc Fifth Circuit.

Indeed, as Judge Jones noted when dissenting from the denial of en banc rehearing of *NRA I*, although "the panel decision purport[ed] to follow *Heller*'s originalist inquiry," it ultimately "d[id] not take seriously *Heller*'s methodology and reasoning." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA II*"), 714 F.3d 334, 336 (5th Cir. 2013) (Jones, J., dissental, joined by Jolly, Smith, Brown Clement, Owen, & Elrod, JJ.). As Judge Jones explained, *Heller*'s close attention to text and history led to the conclusion that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 338 (quoting *Heller*, 554 U.S. at 635). And because of that elevation, courts must "presuppose that the fundamental right to keep and bear arms is not itself subject to interest balancing" and "categorically exists, subject to such limitations as were present at the time of the Amendment's ratification." *Id.* Thus, when the Government "seeks significantly to interfere with the Second Amendment rights of an entire class of citizens"—as the Handgun Ban does—it "bears a heavy burden to show, with relevant historical materials, that the class was originally outside the scope of the Amendment." *Id.* at 339. Otherwise, the categorical

protection of the Second Amendment necessarily trumps the regulation.

In the face of all this, the *NRA I* panel nevertheless believed it was justified in adopting a tiers-of-scrutiny model for two reasons. First, the panel asserted that it adopted its framework "because it comports with the language of *Heller*." *NRA I*, 700 F.3d at 197. In particular, the *NRA I* panel maintained that "by taking rational basis review off the table, and by faulting a dissenting opinion for proposing an interest-balancing inquiry *rather than* a traditional level of scrutiny, the [*Heller*] Court's language suggests that intermediate and strict scrutiny are on the table." *Id.* The panel cited one sentence to support this conclusion: "[Justice Breyer] proposes . . . none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but *rather* a judge-empowering 'interest-balancing inquiry' . . . ." *Id.* (quoting *Heller*, 554 U.S. at 634) (alterations and emphasis in *NRA I*). Relying entirely on the *Heller* Court's use of the word "rather," the panel reasoned that "in the Court's view, the familiar scrutiny tests are not equivalent to interest balancing" and that the Court "distinguished that inquiry from the traditional levels of scrutiny" and therefore did not "reject[] all heightened scrutiny analysis." *Id.*[2] Perhaps recognizing the tenuous chain of inferences supporting this argument, the *NRA I* panel backtracked and modestly claimed that "[a]t the very least, the Court did not expressly foreclose intermediate or strict scrutiny, but instead left [the panel] room to maneuver in crafting a framework." *Id.*

The panel's interpretation of *Heller* is implausible. The panel excised a key phrase from the passage on which it relied, as the *Heller* majority explained that Justice Breyer "proposes,

---

[2] The far more natural inference one should draw from the *Heller* Court's pointed *refusal* to apply means-end scrutiny—and its emphasis that the District's law was unconstitutional *regardless* of the fit between its means and ends—is that such scrutiny is irrelevant for Second Amendment purposes. As then-Judge Kavanaugh explained in his dissent in *Heller II*, "[t]he Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered." 670 F.3d at 1273 n.5.

*explicitly at least*, none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering 'interest-balancing inquiry.'" *Heller*, 554 U.S. at 634 (emphasis added). So *Heller* recognized that however Justice Breyer characterized it, his interest-balancing test was substantively "equivalent" to one of the "familiar scrutiny tests." *NRA I*, 700 F.3d at 197; *see also Heller II*, 670 F.3d at 1280 (Kavanaugh, J., dissenting) ("Strict and intermediate scrutiny are balancing tests and thus are necessarily encompassed by *Heller*'s more general rejection of balancing.").

Second, the *NRA I* panel was "persuaded to adopt the two-step framework outlined above because First Amendment doctrine informs it." *NRA I*, 700 F.3d at 197. According to the panel, "First Amendment doctrine demonstrates that, even with respect to a fundamental constitutional right, [courts] can and should adjust the level of scrutiny according to the severity of the challenged regulation." *Id.* at 198. Thus, the panel "believe[d] that a law impinging upon the Second Amendment right must be reviewed under a properly tuned level of scrutiny—*i.e.*, a level that is proportionate to the severity of the burden that the law imposes on the right." *Id.*

But the *Heller* Court's own reference to First Amendment doctrine betrays the *NRA I* panel's analysis. The *Heller* Court invoked First Amendment cases not to extoll the virtues of intermediate scrutiny interest-balancing but to emphasize the impropriety of interest balancing regarding rights the Amendment was designed to protect: "The Second Amendment . . . [l]ike the First, is the very *product* of an interest balancing by the people—which Justice Breyer would now conduct for them anew." 554 U.S. at 635.

Following *Heller* then, the issue is one of scope: Conduct concerning firearms that falls outside the Amendment's original scope is unprotected, while conduct concerning firearms that falls within that scope—like possessing a handgun in the home for self-defense—cannot be subject

to interest-balancing. To the extent that some First Amendment cases take a categorical approach, while others employ interest-balancing, *Heller* indicated that the Second Amendment should be analyzed under the former, and not the latter. *See Heller II*, 670 F.3d at 1283 (Kavanaugh, J., dissenting) ("Even in the First Amendment case law . . . the Court has not used strict or intermediate scrutiny when considering bans on categories of speech."); *cf. Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 124–25 (1991) (Kennedy, J., concurring) (When the "regulated content has the full protection of the First Amendment," that "is itself a full and sufficient reason for holding the statute unconstitutional" because "it is both unnecessary and incorrect to ask whether the State can show that the statute is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.") (cleaned up).

The panel decision in *NRA I* should be overruled by the en banc Fifth Circuit and replaced with a categorical test centered on the Second Amendment's text, history, and tradition.

**B.     The Government Has Failed To Offer Any Additional Support For The Fifth Circuit's Erroneous Determination In *NRA I*.**

The Fifth Circuit panel in *NRA I* wrongly concluded (but did not hold) that the Handgun Ban was likely sufficiently rooted in history and tradition to pass constitutional muster. As Judge Jones painstakingly detailed in her dissent from the denial of en banc rehearing, the *NRA I* "panel's treatment of pertinent history does not do justice to *Heller*'s tailored approach toward historical sources" and "[a] methodology that more closely followed *Heller* would readily lead to the conclusion that 18-to-20-year-old individuals share in the core right to keep and bear arms under the Second Amendment." *NRA II*, 714 F.3d at 336 (Jones, J., dissental). The Government advances three primary arguments to support *NRA I*'s analysis of the Second Amendment right of 18-to-20-year-olds, but none of these arguments adequately address the shortcomings of that opinion highlighted by Judge Jones.

1.      The Government claims Congress has broad discretion to "prescribe an age qualification within a historically-established range for the exercise of rights and privileges that collectively constitute adulthood" and that this power can alter the age at which an individual is protected by the Second Amendment. Govt. Br. 12. To support this point, the Government notes, until the 1970s the age of majority was generally considered 21, not 18, and therefore 21 is an acceptable age for Congress to select as the cutoff for purchasing handguns from FFLs. *Id.* However, discussion of the age of majority, and the differences between minors and juveniles as understood by the drafters of the Act, are all beside the point. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35. The question of whether 18-to-20-year-olds were considered minors at common law does not affect the constitutional question of whether they were considered to have the right to bear arms when the Second Amendment was adopted—and it is why Congress does not have the power, by dint of its ability to alter the age of majority, *see* Govt. Br. 13, to change the scope of constitutional protections. As Judge Jones explained, "the point remains that those [18-to-20-year-old] minors were in the militia *and, as such*, they were required to own their own weapons. What is *inconceivable* is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms." *NRA II*, 714 F.3d at 342 (Jones, J., dissental).

2.      The Government's argument that militia laws should not inform our understanding of the scope of the Second Amendment right is unavailing for similar reasons—unlike the age of majority, militia laws from the ratification period *do* provide helpful context for understanding the scope of the Second Amendment right. *See Heller*, 554 U.S. at 598-600. Nevertheless, the Government offers several reasons why that context should be ignored or viewed with suspicion.

The Government emphasizes that "the right to arms is not coextensive with the duty to serve in the militia." Govt. Br. 15 (quoting *NRA I*, 700 F.3d at 204 n.17). Undoubtedly true, but that does not mean that courts can simply ignore who composed the militia when the Second Amendment was enacted. Although the Second Amendment's prefatory clause does not "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577, 578. The prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 595, 599. Therefore, although the right is not coextensive with the duty to serve in the militia (it is unquestionably broader and includes, for example, women), logic demands that its protections extend *at least* to those the Framers understood to constitute the militia. Any other reading would sever the "link between the stated purpose and the command," contrary to the instruction of *Heller. Id.* at 577–78.[3]

In the alternative, accepting that militia laws might have some relevance, the Government argues that reliance on the historical scope of the militia "proves too much" because, "[i]n some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia," so it is inconsistent for Plaintiffs' to draw the line at 18-year-olds. Govt. Br. 17. This misconstrues the historical record. As Judge Jones explained, although sixteen was the minimum age for militia participation before the Constitution, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." *NRA II*, 714 F.3d at 340 (Jones, J., dissental) (emphasis added). The Government argues the flipside of this same point as well—

---

[3] As *Heller* emphasized, the "militia" referenced in the Second Amendment's prefatory clause was not an organized army but the collection of "all able-bodied men." *Heller*, 554 U.S. at 596, 600. It is therefore of no importance that neither of the Individual Plaintiffs are members of an organized national or state militia. *See* Govt. Br. 17, 20.

that states freely altered their age requirements for militia service and raised the bar, with some

setting it as high as 21. Govt. Br. 18 (citing *NRA I*, 700 F.3d at 204 n.17). But in the two states

cited in *NRA I* as setting the age at 21, 18-year-olds were nevertheless allowed in the militia. *See*

*NRA II*, 714 F.3d at 341-42 (Jones, J., dissental).

As Judge Jones noted, "[f]rom a historical perspective, it is more than odd that the [*NRA I*]

panel relegate[d] militia service to a footnote." *NRA II*, 714 F.3d at 339 (Jones, J., dissental).

Although the Government devotes considerably more space to the topic, it cannot resolve the

fundamental problem that the evidence of Founding-era militia laws points uniformly in favor of

defining the Second Amendment right to include 18-to-20-year-olds.

**3.**      Finally, the Government argues the Handgun Ban qualifies as a permissible

"measure[] regulating handguns" under *Heller* because, rather than banning possession, the law

merely bans the purchase of handguns from FFLs. Govt. Br. 21. But the right to possess a handgun

implies the right to purchase one. The Third Circuit has noted that a law "prohibiting the

commercial sale of firearms" is "a result [that] would be untenable under *Heller*." *United States v.*

*Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). And contrary to the Government's suggestion

that the Handgun Ban has merely cut off 18-to-20-year-olds from "a particular type of seller," the

effect of the ban is to cut this age group out of the commercial market entirely. To be sure, 18-to-

20-year-olds remain free to purchase handguns second-hand from non-commercial sellers, but that

does not change that the Handgun Ban is not a mere "condition[] and qualification[] on the

commercial sale of arms," *Heller*, 554 U.S. at 627, but rather a wholesale ban on access to the

commercial market for handguns for a segment of the population.

**C.      The Handgun Ban Is Facially Unconstitutional Under Any Heightened Standard of Review.**

Although *NRA I*'s adoption of a tiers-of-scrutiny approach was error in and of itself, it compounded that error by failing to apply that approach properly. First, the panel erred by rejecting strict scrutiny to this restriction on the exercise of a fundamental constitutional right. *NRA I*, 700 F.3d at 205. Second, although the panel purported to apply heightened scrutiny—asking "whether there is a reasonable fit between the law and an important government objective," *NRA I*, 700 F.3d at 207—"there was nothing heightened about what they did." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1542 (2020) (Alito, J., dissenting).

The panel noted that in passing the Act, Congress was concerned with "curbing violent crime," and in particular referenced the "'easy availability of firearms other than a rifle or a shotgun.'" *NRA I*, 700 F.3d at 199, 209 (quoting Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 225–26 (1968). But a governmental interest requires a "reasonable fit" between curbing violent crime and foreclosing 18-to-20-year-old adults from buying handguns in the well-regulated commercial marketplace. In this case, that is not a hypothetical exercise:

> Factually, with forty years of data on these regulations, it is known that the sales ban has not actually advanced this governmental interest. In fact, as the panel concedes, the share of violent crime arrests among the 18-to-20-year age group has increased, and the use of guns by that group is still disproportionately high. Further, the ban perversely assures that when such young adults obtain handguns, they do not do so through licensed firearms dealers, where background checks are required, *see* 18 U.S.C. § 922(t), but they go to the unregulated market.

*NRA II*, 714 F.3d at 346 (Jones, J., dissental); *see also* Gary Kleck, *Regulating Guns Among Young Adults*, 44 AM. J. OF CRIM. JUST. 689, 699 (Apr. 29, 2019) ("The federal ban on 18-to-20 year olds purchasing handguns from licensed dealers introduced in 1969 does not appear to have reduced the 18-to-20 year old share of violent crime."). Judge Jones's final point is vitally important. In 1968, Congress was concerned that "any person can anonymously acquire firearms," but current

federal law guarantees that is not the case, *provided sales are made through an FFL. See* S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112 at 2114. The Government cannot rely on conditions from 1968 to justify the burden on Plaintiffs' rights; this court must consider if "the means-ends fit between the ban and its objective has retained its reasonableness." *NRA I*, 700 F.3d at 209. By forcing 18-to-20-year-olds to acquire handguns *anywhere but through an FFL*, the Handgun Ban reinforces the problem the Government claims it solves.

## IV.   The Court Should Grant Summary Judgment in Favor of Plaintiff Naquin's and the Organizational Plaintiffs' As-Applied Challenge to the Handgun Ban.

Unlike Plaintiffs' facial challenge, no binding precedent controls this Court's decision on the claim that the Handgun Ban is unconstitutional as applied to 18-to-20-year-old women under the standard set out in *NRA I*. As discussed above, the Handgun Ban falls within the scope of the Second Amendment and therefore, this Court must consider whether the Ban passes "intermediate scrutiny" as applied to 18-to-20-year-old women, that is, whether the Government can "demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective." *NRA I*, 700 F.3d at 195. In this case, not only is there no "reasonable fit," there is scarcely any connection at all between the Government's stated objectives and banning 18-to-20-year-old women from buying handguns from FFLs.

The legislative history of the Act demonstrates that a major concern of lawmakers was preventing people from acquiring firearms for the purpose of committing violent crime. *See, e.g.*, *Federal Firearms Act: Hearings on S. 1, Amendment 90 to s. 1, S. 1853, and S. 1854 Before the Subcomm. To Investigate Juvenile Delinquency of the S. Comm. On the Judiciary* ("*Hearing*"), 90th Cong., 1st Sess. 44 (Comm. Print 1967) (statement of Sheldon S. Cohen, IRS Comm'r) (identifying problem as "easy availability of firearms to juvenile offenders, professional criminals, and to others who would use them unlawfully"); *id.* at 333 (statement of Attorney General Ramsey

Clark) (summarizing group to whom guns should be denied as "known dangerous criminals, mental defectives, angry spouses, habitual drunkards, children and drug addicts").

This rationale simply cannot support banning 18-to-20-year-old women from purchasing handguns, because they are exceedingly *unlikely* to commit violent crime, both absolutely and when compared to men who are allowed by federal law to purchase handguns from FFLs. In 2019, for example, only **0.13%** of 18-to-20-year-old women were arrested for a violent crime of any type. *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., https://bit.ly/3zmorNV (June 15, 2021). Males 21-to-24, by contrast, were arrested for violent crimes at a rate approximately four times greater (0.51%), and *all* males 25 and over were arrested for violent crimes nearly twice as often (0.23%). *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Males*, U.S. DEP'T OF JUST., https://bit.ly/3gtPG0i (June 15, 2021). The distinction is even greater when it comes to homicide, with 18-to-20-year-old females being arrested for murder or nonnegligent homicides at a minuscule rate of **0.0019%**, while 21-to-24-year-old males were arrested for such offenses nearly ten times as often (0.018%) and 25-and-over males more than twice as often (0.0053%). *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., https://bit.ly/3zmorNV (June 15, 2021); Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Males*, U.S. DEP'T OF JUST., https://bit.ly/3gtPG0i (June 15, 2021).

The inequity of burdening a woman's right to "keep and bear arms for the purpose of self-defense," *McDonald*, 561 U.S. at 749, is all the more stark given that women are disproportionately

*victimized* by crime. In 2016, 68,009 women between 18 and 20 years old were victims of violent crime,[4] while just 42,358 men in the same age group were similarly victimized. Ex. A, App. 10, Off. of Juvenile Justice & Delinquency Programs, *Easy Access to NIBRS Victims: Most serious offense against victim by Sex of victim for all reporting states, 18 to 20,* NAT'L CENTER FOR JUVENILE JUST., https://bit.ly/3pQFIui (June 15, 2021).

With respect to domestic violence—a particular concern of the proponents of the Act who singled out "angry spouses" and "habitual drunkards" as groups who should be restricted from accessing firearms, *see, e.g.*, *Hearing* at 133 (statement of Attorney General Ramsey Clark)—the statistics are even more lopsided. In 2016, **1,888** women between 18 and 21 were victims of a violent crime at the hands of their spouse and **20,917** more were victimized by their boyfriend or girlfriend; **23 were murdered**. Ex. B, App. 12, Off. of Juvenile Justice & Delinquency Programs, *Easy Access to NIBRS Victims: Most serious offense against victim by Victim-Offender relationship for all reporting states, 18 to 20, Female*, NAT'L CENTER FOR JUVENILE JUST., https://bit.ly/3xlIBpz (June 15, 2021). For men 18 to 20, just 266 were similarly victimized by a spouse and only 3,207 were victimized by a boyfriend or girlfriend; two were murdered. Ex. C, App. 14, Off. of Juvenile Justice & Delinquency Programs, *Easy Access to NIBRS Victims: Most serious offense against victim by Victim-Offender relationship for all reporting states, 18 to 20, Male*, NAT'L CENTER FOR JUVENILE JUST., https://bit.ly/3xlIBpz (June 15, 2021).

A handgun is a particularly important self-defense weapon for women in these contexts because they are often physically smaller than their partners. *See* Inge Anna Larish, *Why Annie Can't Get Her Gun: A Feminist Perspective on the Second Amendment*, 1996 U. ILL. L. REV. 467,

---

[4] Defined to include murder/nonnegligent manslaughter, kidnapping, rape, sodomy, sexual assault with object, fondling, robbery, aggravated and simple assault, and intimidation.

494 n.213 (1996). Over a 28-year period from 1980–2008, while more than 10% of wife and 15% of girlfriend victims of homicide at the hands of their partner were killed by "force" not involving any weapon, just 1% of husband and 1.3% of boyfriend victims were killed that way. Bureau of Just. Statistics, *Homicide Trends in the United States, 1980-*2008, Table 11: Homicides, by intimate relationship and type of weapon, 1980-2008, U.S. DEP'T OF JUST. (November 2011), https://bit.ly/3gcSosa. Given this background, a handgun can serve as a powerful equalizer and deterrent for a woman faced with the threat of intimate danger. *See* Hans Toch & Alan J. Lizotte, *Research and Policy: The Case of Gun Control*, *in* PSYCH. AND SOC. POL'Y, 233 (Peter Suedfeld & Philip E. Tetlock 1st ed. 1992) ("Women who are confronted with a sexual assault are significantly less likely to experience a completed rape if they resist with a weapon."); *see also*, Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (Fall 1995), https://bit.ly/2ROM2Gk ("Each year in the U.S. there are about 2.2 to 2.5 million [defensive gun uses] of all types by civilians against humans, with about 1.5 to 1.9 million of the incidents involving use of handguns."). "Guns are . . . the most effective self-defense tools for women, the elderly, the weak, the infirm, and the physically handicapped." Larish, 1996 U. ILL. L. REV. at 498.

To summarize, the Government has identified curbing violent crime as its goal but in the process has employed a strategy that has stripped all 18-to-20-year-old women, who face disproportionate crime victimization, of the right to lawfully buy a handgun in the commercial market when just over 0.1% of that group was arrested for a violent crime in 2019; *see NRA II*, 714 F.3d at 346–47 (Jones, J., dissental) (discussing *Craig v. Boren*, 429 U.S. 190, 202–03 (1976) finding a 2% fit between young males and drunk driving to be "unduly tenuous" for intermediate scrutiny). The Handgun Ban cannot pass intermediate scrutiny as applied to a class of individuals

who pose a disproportionately *small* risk of violent crime and have a disproportionately *great* need for handguns for self-defense. Indeed, applying the Handgun Ban to such a class is perverse.

Nevertheless, the Government would have the court blind itself to these realities because "the Fifth Circuit has already held that the age qualification satisfies constitutional means-end scrutiny with respect to persons under twenty-one." Govt. Br. 25. However, "[i]t is well-established that the facial upholding of a law does not prevent future as-applied challenges." *In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotations omitted) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another."). To sustain a facial challenge to a law under the Second Amendment, "the challenger must establish that no set of circumstances exists under which the [Handgun Ban] would be valid." *McGinnis*, 956 F.3d at 752 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But in order to succeed on an as-applied challenge, as the name suggests, Plaintiffs must merely show that the law is unconstitutional as-applied to them. As a result, there is nothing unusual about a plaintiff succeeding on an as-applied challenge where a facial challenge would fail. In fact, "as-applied challenges are generally favored as a matter of judicial restraint because they result in a narrow remedy," provided the Plaintiffs provide "particularized facts" allowing the court to "circumscribe[ the] remedy." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014).

To bring this case outside of the clear weight of the authority, the Government cites, but does not explain its reliance on, cases from the commercial speech context. Presumably, the Government cites *United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993), which was an as-applied challenge to a federal law limiting a North Carolina radio station's ability to advertise the Virginia state lottery, for the proposition that the Court would "judge the validity of the

restriction . . . by the relation it bears to the general problem of accommodating the policies of both lottery and nonlottery States, not by the extent to which it furthers the Government's interest in an individual case." *Id.* at 430–31. But that is merely another way of saying that, where small exceptions to the rule would not seriously hurt the government's proposed interest, no exception is warranted if the government can show a "reasonable fit" between a problem and its solution *as applied to that individual*. *Id.* at 429–30 ("[A]pplying the restriction to a broadcaster such as Edge directly advances the governmental interest in enforcing the restriction in nonlottery States, while not interfering with the policy of lottery States like Virginia. We think this would be the case even if it were true, which it is not, that applying the general statutory restriction to Edge, in isolation, would no more than marginally insulate the North Carolinians . . . from hearing lottery ads.") And even if *Edge Broadcasting* means what the Government implies it does, it dealt with regulating advertising for a "'vice' activity that could be, and frequently has been, banned altogether" and so "implicate[d] no constitutionally protected right" other than the right to freedom of commercial speech. *Id.* at 426. Here, by contrast, the right to keep and bear arms is "among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. In such a case, far from being abnormal, "as-applied challenges are the basic building blocks of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (brackets omitted).

In line with this precedent, the Third Circuit, sitting en banc, rejected the proposition that, because it had previously upheld 18 U.S.C. § 922(g)(1)'s prohibition on possession of a firearm by a person convicted of a crime punishable by imprisonment for more than a year against a facial challenge, it could not consider as-applied challenges to the same law. *Binderup v. Atty. Gen.*, 836

F.3d 336, 350 (3d Cir. 2016) (en banc) (Ambro, J., plurality op.).[5] In spite of "the Supreme Court's characterization of felon dispossession as 'presumptively lawful' in *Heller*" and its own opinion holding that the prohibition "does not on its face violate the Second Amendment," *id.* at 357 (Hardiman, J., concurring), the court considered evidence from two individuals regarding "whether their particular circumstances remove them from the constitutional sweep" of the statute, *id.* at 346 (Ambro, J., plurality op.). Ultimately, the court concluded that their particular circumstances did just that—it found that the government fell "well short of satisfying its burden—even under intermediate scrutiny" to show that there was a "substantial fit between the continuing disarmament of the Challengers and an important government interest." *Id.* at 355–56. This court should reject the Government's implicit invitation to break with the ordinary practice of evaluating as-applied challenges and follow the en banc Third Circuit's approach to assess whether or not there is a substantial fit between applying the Handgun Ban to women between the ages of 18 and 21 and a reduction in violent crime. The evidence and experience of the last fifty years demonstrates there is not.[6]

---

[5] Although the opinion of the court was fractured, a majority of judges supported the use of an as-applied challenge under the Second Amendment against a regulation that was not facially unconstitutional. *See id.* at 366–67 (Hardiman, J., concurring) ("[T]o deny [some]one even the opportunity to develop a factual basis in support of his constitutional claim would run afoul of both Supreme Court guidance regarding the scope of the Second Amendment and the concept of an as-applied challenge.") (cleaned up).

[6] The Government also suggests, in a footnote, that invalidating the Handgun Ban as to 18-to-20-year-old women "could present equal protection problems." Govt. Br. 26 n.12. By confining this argument to a footnote, the Government has forfeited it. *See, e.g., Denton Cnty. Elec. Coop., Inc. v. Nat'l Labor Relations Bd.*, 962 F.3d 161, 167 n.4 (5th Cir. 2020). In any event, this argument fails. If an injunction barring application of the Handgun Ban to 18-to-20-year-old women implicated the Equal Protection Clause, its gender distinction would be subject to intermediate scrutiny. *Craig*, 429 U.S. at 197–98. And if barring 18-to-20-year-olds from purchasing handguns *generally* satisfies intermediate scrutiny (as *NRA I* holds and as this Court is therefore bound to conclude), it must *also* satisfy intermediate scrutiny to exempt women from this restriction. That is because the distinction in violent crime rates between 18-to-20-year-old men and 18-to-20-year-old women *is larger than* that between 18-to-20-year-olds generally and those 21 and older.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to dismiss

and for summary judgment and grant Plaintiffs' cross-motion for summary judgment.

Dated: June 17, 2021                     Respectfully submitted,

/s/ George J. Armbruster III             /s/ David H. Thompson
George J. Armbruster III                 David H. Thompson
Armbruster & Associates, APLC            Peter A. Patterson
332 E. Farrel Road, Suite D              William V. Bergstrom
Lafayette, LA 70508                      COOPER & KIRK, PLLC
Phone: 337-889-5511                      1523 New Hampshire Ave., NW
Fax: 337-889-5512                        Washington, DC 20036
Email: george@arm-assoc.com              Telephone: (202) 220-9600
Local Counsel                            Email: dthompson@cooperkirk.com
                                         Admitted *Pro Hac Vice*

                                         /s/ Raymond M . DiGuiseppe
                                         Raymond M. DiGuiseppe - T.A.
                                         THE DIGUISEPPE LAW FIRM, P.C.
                                         4320 Southport-Supply Road, Suite 300
                                         Southport, NC 28461
                                         Phone:910-713-8804
                                         Fax: 910-672-7705
                                         Email: law.rmd@gmail.com
                                         Admitted *Pro Hac Vice*

                                         /s/ Adam Kraut
                                         Adam Kraut
                                         FIREARMS POLICY COALITION
                                         1215 K Street, 17th Floor
                                         Sacramento, CA 95814
                                         Phone: (916) 476-2342

---

*Compare* Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: Females*, U.S. DEP'T OF JUST., https://bit.ly/3zmorNV (June 15, 2021) *and See* Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: Males*, U.S. DEP'T OF JUST., https://bit.ly/3gtPG0i (June 15, 2021) (showing 0.5% of 18-to-20-year-old men had been arrested for violent crime that year compared with just 0.13% of 18-to-20-year-old women) *with* Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gpBXYw (June 15, 2021) (showing arrests of 0.32% of 18-to-20-year-olds, compared with 0.34% of 21-to-24-year-olds and 0.15% of those over 25). In other words, whatever rationale exists for barring 18-to-20-year-olds from purchasing handguns applies with even greater force to exempting women from the ban.

Email: akraut@fpclaw.org
Admitted *Pro Hac Vice*

/s/ Joseph Greenlee
Joseph Greenlee
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
Phone: (916) 438-9237
Email: jgr@fpclaw.org
Admitted *Pro Hac Vice*

/s/ John W. Dillon
John W. Dillon
DILLON LAW GROUP APC
2647 Gateway Road
Carlsbad, CA 92009
Phone: (760) 642-7150
Fax: (760) 642-7151
Email: jdillon@dillonlawgp.com
Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*