UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CALEB REESE, ET AL.                    CASE NO.  6:20-CV-01438

VERSUS                                 JUDGE ROBERT R. SUMMERHAYS

BUREAU OF ALCOHOL TOBACCO              MAGISTRATE JUDGE WHITEHURST
FIREARMS & EXPLOSIVES, ET AL.

<u>**MEMORANDUM RULING**</u>

This suit is brought to relitigate the constitutionality of federal laws prohibiting federally

licensed firearms dealers from selling handguns or handgun ammunition to persons aged 18 to 20.[1]

Plaintiffs Caleb Reese and Emily Naquin ("Individual Plaintiffs") are citizens of the United States

and the State of Louisiana and are between the ages of 18 and 21.[2] Plaintiffs Firearms Policy

Coalition, Inc., The Second Amendment Foundation, and Louisiana Shooting Association

("Organizational Plaintiffs") allege that their members include persons under the age of 21, as well

as federally licensed firearms retailers—*i.e.* federal firearms licensees ("FFLs")—some of whom

reside in the Western District of Louisiana.[3] The Organizational Plaintiffs bring this suit on behalf

of their "individual members who would purchase handguns and handgun ammunition from lawful

retailers, and [their] member FFL handgun retailers who would sell handguns and handgun

ammunition to adults under the age of twenty-one, but are prohibited from doing so by the

Handgun Ban enforced by Defendants."[4] The Individual Plaintiffs allege that they are members of

each of the forgoing organizations.[5]

---

[1] *See* 18 U.S.C. § 922(b)(1) and (c)(1); 27 C.F.R. §§ 478.99(b)(1), 478.96(b), and 478.124(a) and (f).
[2] A third individual plaintiff, Joseph Granich, voluntarily withdrew his claims. ECF Nos. 41, 44.
[3] ECF No. 29 at 4–6, ¶¶ 9–11.
[4] *Id.* at ¶ 9; *see also* ¶¶ 10–11.
[5] *Id.* at pp. 3, 4; ¶¶ 6, 8 .

Plaintiffs seek a declaratory judgment that the challenged laws are facially unconstitutional, as well as injunctive relief, arguing the challenged laws violate the Second Amendment in that they "prevent law-abiding, responsible adult citizens under age twenty-one" from purchasing handguns from FFLs (Count I).[6] Alternatively, Plaintiffs seek a declaratory judgment that the laws are unconstitutional as applied to 18 to 20-year-old women, as well as injunctive relief (Count II).[7] Plaintiffs further seek "nominal damages for constitutional injuries caused by Defendants Lombardo's and Garland's enforcement of the Handgun Ban and resulting deprivation of Plaintiffs' Second Amendment rights."[8] Plaintiffs acknowledge the Fifth Circuit in *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA*") held that the forgoing laws are constitutional, but they bring this suit "as a good faith attempt to change the law."[9]

The parties have filed dispositive cross-motions which are ripe for adjudication. Specifically, Defendants—Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Regina Lombardo (Acting Director of the ATF),[10] and Merrick B. Garland (Attorney General of the United States)—have filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, or alternatively, for summary judgment on all claims.[11] Plaintiffs have filed a motion for partial summary judgment, seeking judgment in their favor on Count II.[12]

---

[6] *Id.* at 17–21, 23–24.

[7] *Id.* at 21-23, 24.

[8] *Id.* at 7, 24.

[9] ECF No. 29 at 3, ¶ 4 (citing *NRA*, 714 F.3d 185, 191 (5th Cir. 2012), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022)). The original briefing in this matter was filed prior to the issuance of *Bruen*, which abrogated *NRA* in part, as discussed in Section III(A), *infra*.

[10] The Court notes that Steven M. Dettelbach was sworn in as the Director of the ATF on July 13, 2022. *See* https://www.atf.gov/about-atf/executive-staff/director#:~:text=Steven%20Dettelbach,Mr. (last visited Nov. 10, 2022).

[11] ECF No. 32. Giffords Law Center to Prevent Gun Violence has filed an amicus curiae brief in support of Defendants' motion. ECF No. 40; *see also* ECF No. 39.

[12] ECF No. 49.

# I.

## JURISDICTION

The Court begins with jurisdiction. Defendants assert Plaintiffs have failed to establish Article III standing, and therefore seek dismissal of all claims pursuant to Rule 12(b)(1).[13] Motions filed under Rule 12(b)(1) permit a party to challenge a court's subject-matter jurisdiction to hear a case. A district court may dismiss an action for lack of subject-matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, as well as the court's resolution of disputed facts.[14] The burden of proof is on the party asserting jurisdiction.[15] At the motion to dismiss stage, this requires a plaintiff to allege "a plausible set of facts establishing jurisdiction."[16]

Standing—*i.e.*, "the power of the court to entertain the suit"—is the "threshold question in every federal case."[17] Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."[18] Standing to sue is a jurisprudential doctrine used to ensure federal courts do not exceed their limited authority over cases and controversies.[19] Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."[20] In its simplest terms, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[21] The "irreducible

---

[13] ECF No. 35 at 13–16.
[14] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Willoughby v. U.S. Dept. of the Army*, 730 F.3d 476, 479 (5th Cir. 2013).
[15] *McMahon v. Fenves*, 946 F.3d 266, 270 (5th Cir. 2020); *Ramming* at 161.
[16] *McMahon* at 270 (quoting *Physician Hosps. of Am. v. Sebelius*, 691 F3d 649, 652 (5th Cir. 2012)).
[17] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).
[18] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., Art. III, § 2).
[19] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[20] *Spokeo* at 338.
[21] *Warth* at 498.

constitutional minimum" of standing consists of three elements which the plaintiff must satisfy: (1) the plaintiff suffered an injury in fact—*i.e.*, a concrete and particularized invasion of a legally protected interest; (2) the injury is fairly traceable to the challenged conduct of the defendant, which means there must be a causal connection between the injury and the conduct complained of; and (3) it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable judicial decision.[22] Further, a plaintiff must have standing for each claim asserted and for each form of relief sought.[23] An association has standing to bring suit on behalf of its members if: (1) its individual members would have standing to sue in their own right; (2) the association seeks to vindicate interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members.[24]

Here, Defendants contend the Individual Plaintiffs lack standing to sue because they have failed to plead an "imminent injury traceable to Defendants."[25] Defendants contend the Individual Plaintiffs have an available option under federal law for obtaining a handgun—*i.e.*, their parents or guardians may lawfully purchase handguns from FFLs and gift them to the Individual Plaintiffs—and therefore Plaintiffs suffer no injury traceable to Defendants sufficient to confer standing.[26] According to Defendants, the Individual Plaintiffs "may not manufacture injury" by forgoing "legally available means by which they may obtain handguns."[27] As to the claims asserted by the Organizational Plaintiffs on behalf of their members between the ages of 18 and 20, Defendants contend they lack standing because those members do not have standing to sue in their

---

[22] *Spokeo* at 338, 339; *see also Lujan* at 560.
[23] *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *El Paso County, Texas v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020).
[24] *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022); *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).
[25] ECF No. 35 at 14
[26] *Id.* at 14–15.
[27] *Id.*

own right for the reasons previously set forth.[28] As to the claims asserted by the Organizational Plaintiffs on behalf of their member FFLs, Defendants argue standing is absent because Plaintiffs have failed to adequately plead injury in fact. Specifically, Defendants contend that the Organizational Plaintiffs' allegation that but-for the challenged restrictions, they would sell handguns and handgun ammunition to persons aged 18 to 20, does not identify an injury that is sufficiently concrete and particularized to satisfy standing requirements.[29] Defendants concede the Fifth Circuit rejected these arguments in *NRA*.[30]

In *NRA*, suit was brought challenging the same laws on the same grounds by the same category of persons—*i.e.*, individual plaintiffs between the ages of 18 and 20, and the NRA on behalf of its 18 to 20-year-old members and on behalf of its FFL members.[31] The Fifth Circuit found plaintiffs had standing to sue, reasoning:

> The government is correct that the challenged federal laws do not bar 18–to–20–year–olds from possessing or using handguns. The laws also do not bar 18–to–20–year–olds from receiving handguns from parents or guardians. Yet, by prohibiting FFLs from selling handguns to 18–to–20–year–olds, the laws cause those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs.
>
> Standing may be satisfied by the presence of at least one individual plaintiff who has demonstrated standing to assert the contested rights as his own. Having established [the individual plaintiff's] standing and the NRA's associational standing on behalf of its 18–to–20–year–olds members, we need not discuss the NRA's associational standing on behalf of its FFL members.[32]

---

[28] *Id.* at 15.

[29] *Id.* at 16 (quoting *Lujan*, 504 U.S. at 560). Defendants additionally note Plaintiffs do not identify any member who was allegedly "frustrated from selling any particular handgun to any person," nor do Plaintiffs account for the fact that "parents or others can purchase handguns directly from licensed dealers" as gifts for minors in their care. *Id.*

[30] *Id.* at 14 n.4. Defendants lodge this argument to preserve it for appellate purposes. *Id.*

[31] *NRA*, 700 F.3d at 188.

[32] *Id.* at 191–92 (internal citations, quotation marks, alterations and footnotes omitted); *see also National Rifle Ass'n of America, Inc. v. McCaw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013).

Here, Individual Plaintiffs assert that but for the challenged laws, they would be eligible to purchase handguns from FFLs and would in fact do so.[33] Organizational Plaintiffs submit sworn declarations attesting that their members include the Individual Plaintiffs, as well as FFLs located in Louisiana who would sell handguns to persons under age 21, but are prohibited from doing so due to the challenged restrictions.[34] Defendants do not dispute the forgoing factual allegations. Because the Fifth Circuit has rejected the standing arguments presented in this case, the Court finds Plaintiffs have established standing. Accordingly, Defendants' motion is denied to the extent it seeks dismissal pursuant to Rule 12(b)(1).

## II.
### STANDARD OF REVIEW

### A.    Motion to Dismiss—Rule 12(b)(6)

Motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable clam.[35] Such a motion "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts."[36] To overcome a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.[37] The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[38] Although a complaint does not need detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-

---

[33] ECF No. 29 at 7–8, 9–10; *see also* ECF No. 50-1 at 3–4 (Declaration of Emily Naquin).
[34] ECF No. 50-1 at 6, 8, 10.
[35] *Ramming*, 281 F.3d at 161.
[36] *Id.* at 161–62.
[37] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).
[38] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level," and not merely create "a suspicion [of] a legally cognizable right of action.") (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004)).

harmed-me accusation."[39] A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements" will not suffice,[40] nor will a complaint that merely tenders "naked assertions devoid of further factual enhancement."[41] When deciding a Rule 12(b)(6) motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[42] However, this tenet does not apply to conclusory allegations, unwarranted deductions, or legal conclusions couched as factual allegations, as such assertions do not constitute "well-pleaded facts."[43] In considering a Rule 12(b)(6) motion, the district court generally "must limit itself to the contents of the pleadings, including attachments thereto."[44] One exception to this rule is that district courts "may permissibly refer to matters of public record."[45]

## B.   Motion for Summary Judgment—Rule 56

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[46] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[47] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating

---

[39] *Id.*

[40] *Twombly*, 550 U.S. at 555.

[41] *Iqbal*, 556 U.S. at 678 (internal quotation marks, alterations omitted) (quoting *Twombly* at 557).

[42] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted); *see also Iqbal* at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")

[43] *Twombly* at 555; *Iqbal* at 678.

[44] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

[45] *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005).

[46] Fed. R. Civ. P. 56(a).

[47] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

by competent summary judgment proof that there is an issue of material fact warranting trial.[48]

The opposing party may not create a genuine dispute simply by alleging that a dispute exists. Rather, the opponent must cite "to particular parts of materials in the record," or show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[49] When reviewing a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[50] Credibility determinations, assessments of the probative value of the evidence, inferences drawn from the facts and the like are not to be considered on summary judgment, as those are matters to be decided by the factfinder at trial.[51]

## III.
### APPLICABLE LAW

**A.      Constitutional Framework**

The Second Amendment, adopted in 1791, provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[52] For more than two hundred years after its adoption, scant jurisprudence existed discussing this right.[53] But in 2008 in *District of Columbia v. Heller*, the Supreme Court issued

---

[48] *Lindsey v. Sears Roebuck and Co*., 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[49] FED. R. CIV. P. 56(c)(1); *see also id.* at (c)(3) (the court need only consider the cited materials, although it is permitted to consider other materials in the record as well).
[50] *Roberts v. Cardinal Servs., Inc*., 266 F.3d 368, 373 (5th Cir. 2001).
[51] *See e.g. Man Roland, Inc. v. Kreitz Motor Exp., Inc*., 438 F.3d 476, 478 (5th Cir. 2006); *Int'l Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1263 (5th Cir. 1991).
[52] U.S. CONST. amend. II.
[53] *See e.g.* Andrew White, *In Defense of Self and Home: The Problems with Limiting Second Amendment Rights for Young Adults Based on Their Age*, 90 U. Cin. L. Rev. 1241, 1241 (2022); Zachary S. Halpern,

the first of a trilogy of rulings interpreting the Second Amendment.[54] *Heller* determined that the Second Amendment codified a pre-existing, individual right, belonging to "law-abiding, responsible citizens," that encompasses the possession of handguns in the home for self-defense.[55] Based upon this determination, the Supreme Court struck down a D.C. ordinance banning "handgun possession in the home" as unconstitutional.[56] Two years later in *McDonald v. City of Chicago*, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" against the States.[57] This year in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding, adult citizens" to carry handguns for self-defense outside of the home.[58]

Following the issuance of *Heller*, eleven courts of appeal, including the Fifth Circuit, adopted a two-step framework for evaluating firearms regulations.[59] The first step of that framework required the government to justify a challenged law by showing that it "regulates activity falling outside the scope of the right as originally understood," based upon its "historical meaning."[60] If the government was successful in demonstrating the regulated conduct fell beyond the Amendment's original scope, the analysis ended, as the regulated activity was categorically

---

*Young Guns: The Constitutionality of Raising the Minimum Purchase Age for Firearms to Twenty-One*, 63 B.C. L. Rev. 1421, 1429-30 (2022).

[54] *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

[55] *Id.* at 635.

[56] *Id.*

[57] *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

[58] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2134; *id.* at 2123, 2156 (finding a New York law, which required applicants for public carry permits to demonstrate "proper-cause"—defined by New York authorities as a special need for self-protection distinguishable from that of the general community—before issuance of such permits, violates the constitutional rights of "citizens with ordinary self-defense needs from exercising their right to keep and bear arms.")

[59] *Bruen* at 2127 n.4; *NRA*, 700 F.3d at 194.

[60] *Bruen* at 2126; *see also NRA* at 194 ("[T]he first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right," which is determined by looking to "whether the law harmonizes with the historical tradition associated with the Second Amendment guarantee.")

unprotected.[61] But if the historical evidence was inconclusive or suggested that the regulated activity was not categorically unprotected, the examination proceeded to step two.[62] At step two, courts analyzed whether the challenged law survived the appropriate level of means-end scrutiny.[63] *Bruen* abrogated the two-step inquiry adopted by the courts of appeal. Although *Bruen* found step one of the predominant framework to be "broadly consistent with *Heller*," it found that step two was "one step too many."[64] *Bruen* then "made the constitutional standard endorsed in *Heller* more explicit,"[65] and announced the following standard for evaluating modern firearms regulations:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[66]

Thus, if a challenged regulation prohibits conduct that is protected by the Second Amendment, courts must examine whether the regulation is consistent with the Nation's historical tradition of

---

[61] *Bruen* at 2126; *see also NRA* at 195.

[62] *Bruen* at 2126.

[63] *Bruen* at 2126–27; *see also NRA* at 195 ("If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny.")

[64] *Bruen* at 2126–27.

[65] *Bruen* at 2134.

[66] *Bruen* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Bruen* at 2129–30. *Bruen* did not state which party bears the burden of showing the Second Amendment's plain text covers an individual's conduct, likely because that issue was not in dispute. *Bruen* at 2134 ("It is undisputed that petitioners . . . —two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects.") However, it would seem that the challenger of a firearm restriction bears the initial burden of showing the challenged conduct is protected by the Second Amendment. *Bruen* instructed that once it is shown that the conduct is protected by the Second Amendment, the government bears the burden of justifying the regulation by showing it is consistent with the Nation's historical tradition of firearm regulations. It stated that this standard "accords with how we protect other constitutional rights," such as "the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130. That same analogy would place the initial burden of showing the challenged conduct is covered by the Second Amendment on the challenger. *See e.g. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013).

firearm regulation. To accomplish this task, courts are to look to "relevantly similar" historical regulations for a "proper analogue."[67] There need only be "a well-established and representative historical *analogue*, not a historical *twin*."[68] Two of the metrics courts may use in determining whether regulations are relevantly similar are "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[69]

*Bruen* warned that "not all history is created equal."[70] Because *Heller* determined the Second Amendment codified a pre-existing right "inherited from our English ancestors," both *Heller* and *Bruen* found "English history dating from the late 1600s, along with American colonial views leading up to the founding," to be of particular relevance.[71] *Bruen* additionally found historical tradition post-ratification through the early nineteenth century to be highly relevant to the extent it was not "*inconsistent* with the original meaning of the constitutional text."[72] Finally, while *Bruen* considered historical evidence from Reconstruction through the late nineteenth century, it emphasized evidence from that period was used "as mere confirmation" of the Court's earlier conclusions.[73] The Supreme Court acknowledged that this "historical analysis can be difficult," as it requires "resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it."[74] Accordingly, courts may choose and indeed

---

[67] *Bruen* at 2132; *see also id.* at 2133 (noting the absence of historical disputes regarding the lawfulness of a firearm prohibition may be evidence of constitutional permissibility).
[68] *Id.* at 2133 ("So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.")
[69] *Id.*
[70] *Id.* at 2136.
[71] *Id.* at 2127 (quoting *Heller*, 554 U.S. at 599).
[72] *Id.* at 2137 (quoting *Heller v. D.C.*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).
[73] *Id.*
[74] *Id.* at 2130 (alteration omitted) (quoting *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring)).

are "entitled to decide a case based on the historical record compiled by the parties," because "in our adversarial system of adjudication, we follow the principle of party presentation."[75]

While the Supreme Court has not yet provided an "exhaustive historical analysis . . . of the full scope of the Second Amendment," *Heller* did discuss some of its outer contours:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions of the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[76]

The Court explained that it identified this list of "presumptively lawful regulatory measures only as examples," and not as an exhaustive list.[77] In his concurring opinion in *Bruen*, Justice Alito reiterated that the Court's holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun," nor does it "expand the categories of people who may lawfully possess a gun, and federal law generally . . . bars the sale of a handgun to anyone under the age of 21, §§ 922(b)(1), (c)(1)."[78]

---

[75] *Id.* at 2130 & n.6 (alteration omitted); *see also id.* at 2150 ("Of course, we are not obligated to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.")

[76] *Heller*, 554 U.S. at 626-27 (internal citations omitted) (additionally noting the Second Amendment "does not extend to all types of weapons, but rather, only those typically possessed by law-abiding citizens for lawful purposes"); *see also Bruen* at 2138 n.9 (indicating the licensing requirements for public carry used by the majority of states likely pass constitutional muster, as those "shall-issue' regimes utilize objective criteria "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." (internal quotation marks omitted)).

[77] *Heller* at 627 n.26; *see also id.* at 627 (additionally noting private ownership of military-style weapons and short-barreled shotguns had long been forbidden).

[78] *Bruen* at 2157–58.

**B.     The Challenged Firearms Restrictions**

Following a multi-year inquiry into violent crime, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968.[79] The preamble declares that "the ease with which any person can acquire firearms other than a rifle or shotgun (including . . . juveniles without the knowledge or consent of their parents or guardians . . . ) is a significant factor in the prevalence of lawlessness and violent crime in the United States. . . ."[80] The congressional investigation found that "concealable weapons" had "been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior." [81] Through the Act, Congress sought to address this and other safety issues relating to firearms without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity."[82] In furtherance of these goals, Congress enacted restrictions prohibiting sales of handguns to persons under age twenty-one by FFLs—*i.e.*, "safety-driven, age-based categorical restrictions on handgun access."[83]

18 U.S.C. § 922(b)(1) makes it unlawful for any federally licensed firearms dealer "to sell or deliver . . . any firearm or ammunition . . . other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age." 18 U.S.C. § 922(c)(1) provides that a federally licensed firearms dealer "may sell a firearm to a person who does not appear in person at the licensee's

---

[79] *NRA*, 700 F.3d at 198.
[80] Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), 82 Stat. 197, 225 (1968).
[81] *Id.* at § 901(a)(5) and (6), 82 Stat. 197, 225-26. As used in the Act, the term "minor" refers to persons under the age of 21, while the term "juvenile" refers to persons under the age of 18. *NRA* at 199 n.11.
[82] *Id.* at § 901(b), 82 Stat. 197, 226.
[83] *NRA* at 199. At the time of the Act's passage, the age of majority at common law was 21. *Id.* at n.11.

business premises . . . only if . . . the transferee submits to the transferor a sworn statement"

attesting that, in the case of a handgun, he or she is 21 or older. The forgoing statutes are

implemented by regulations that similarly restrict handgun sales to individuals aged 21 or older.[84]

Thus, while federal law prohibits the direct purchase of handguns from FFLs by persons aged 18

to 20, such persons may still possess and use handguns, they may receive handguns as gifts, and

they may purchase handguns through unlicensed, private sales.[85] Further, 18 to 20-year-olds enjoy

the full scope of rights under the Second Amendment with regard to long guns—*i.e.*, they may

possess, use and purchase long guns, and ammunition for long guns, directly from FFLs.[86]

## IV.
### APPLICATION

### A.    Facial Challenge—Count I

In light of *Bruen*, the questions this Court must answer are: (1) whether the Second

Amendment's plain text protects the ability of 18 to 20-year-olds to directly purchase handguns

from FFLs, and if so, then (2) whether the challenged restrictions are consistent with the Nation's

historical tradition of firearm regulation. Defendants contend 18 to 20-year-olds do not enjoy the

full scope of protection granted by the Second Amendment, relying primarily upon the findings of

the Fifth Circuit in *NRA*.[87] Plaintiffs disagree and rely upon the arguments of the dissenting opinion

to the denial of en banc review of *NRA* ("*NRA II*").[88] Following the issuance of *Bruen*, Plaintiffs

filed a Notice of Supplemental Authority asserting that in light of *Bruen*, their facial challenge "is

no longer controlled by *NRA* and the Court can and should grant summary judgment in favor of

---

[84] *See* 27 C.F.R. §§ 478.99(b)(1), 478.96(b), and 478.124(a), (f).
[85] *NRA* at 189-90.
[86] 18 U.S.C. § 922(b)(1) and (c)(1).
[87] ECF No. 35 at 18, 20–27.
[88] ECF No. 50 at 18–23 (citing *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA II*"), 714 F.3d 334, 335 (5th Cir. 2013) (Jones, J., dissenting) (joined by Judges Jolly, Smith, Clement, Owen and Elrod)).

Plaintiffs."[89] Defendants respond that "the Fifth Circuit's conclusions and the relevant historical analogues discussed in *NRA*" satisfy the *Bruen* test, and therefore judgment in their favor remains warranted.[90] Neither party requested leave to file supplemental briefing.

With respect to the first question that the Court must address under *Bruen*, the statute and regulations at issue here do not explicitly restrict the rights of 18 to 20-year-olds to "keep and bear Arms," as they do not restrict this age group from owning, possessing, or carrying handguns for self-defense.[91] Nevertheless, while sales restrictions do not explicitly infringe the right to "keep or bear Arms," a complete restriction on the sale of firearms could effectively gut the right to own or possess firearms by foreclosing the ability of "the people" to legally purchase firearms. The statute and regulations here, in contrast, do not impose a total ban on the sale of firearms. They do not prevent this age group from receiving handguns as gifts from parents or guardians, nor do they prohibit this age group from purchasing handguns in "private sales" from non-FFL sellers. They also do not prohibit this age group from purchasing long-guns from FFLs. On the other hand, the statute and regulations at issue could effectively foreclose certain members of this age group from acquiring handguns if they do not have a parent or guardian available to provide them a handgun, or they do not have access to a private sale. Moreover, the panel decision in *NRA* appears to assume that the restrictions at issue implicate this age group's Second Amendment rights, even though the panel ultimately decided that the regulations did not violate the protections of the Second Amendment. Out of an abundance of caution, the Court will assume that the statute and regulations

---

[89] ECF No. 62 at 1. As Plaintiffs' motion solely seeks summary judgment on their as-applied challenge (Count II), any grant of summary judgment in Plaintiffs' favor on their facial challenge would necessarily issue *sua sponte*.

[90] ECF No. 63 at 3.

[91] In contrast, the Texas state statute at issue in *Firearms Pol'y Coal., Inc. v. McCraw* prohibited law-abiding 18 to 20-year-olds from carrying handguns for self-defense outside the home. No. 4:21-CV-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022). Applying *Bruen*, the district court held that the conduct proscribed by the Texas statute is protected by the Second Amendment.

at issue proscribe conduct covered by the plain text of the Second Amendment. The Court therefore turns to the historical prong of the *Bruen* analysis: whether the restrictions at issue are "consistent with the Nation's historical tradition of firearm regulation."[92]

Although the Fifth Circuit's opinion in *NRA* was issued before *Bruen* and employs the "two-step" analysis rejected by *Bruen,* the *NRA* court considered and analyzed the historical backdrop of the restrictions at issue here. In *NRA*, the individual and organizational plaintiffs challenged the same laws at issue in this case on the same grounds—*i.e.*, whether § 922(b) and (c) "burden conduct that is protected by the Second Amendment."[93] The Court found that the pre-Revolution and founding-era historical record showed "a variety of gun safety regulations were on the books."[94] One type of such regulations were "laws disarming certain groups and restricting sales to certain groups" for reasons of public safety.[95] For example, laws were enacted "that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation," because despite the fact that "these Loyalists were neither criminals nor traitors," American legislators determined that permitting such persons to keep and bear arms posed a potential danger.[96] Other laws confiscated weapons from law-abiding slaves and freedmen.[97] The court discussed that during this era, there existed the "classical republican notion that only those with adequate civic 'virtue' could claim the right to arms," and that "[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the

---

[92] *Bruen* at 2126.
[93] *NRA*, 700 F.3d at 200.
[94] *Id.*
[95] *Id.* (additionally identifying "safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service . . . , [and] laws prohibiting the use of firearms on certain occasions and in certain places . . . .") (citations omitted).
[96] *Id.* (citations omitted).
[97] *Id.* (citations omitted); *see also Range v. Attorney Gen. United States*, 53 F.4th 262, 274–81 (3d Cir. 2022).

unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue."[98] In light of the fact that the age of majority from the founding-era until the 1970s was 21, the court concluded:

> If a representative citizen of the founding era conceived of a "minor" as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18–to–20–year–olds as "minors," then it stands to reason that the citizen would have supported restricting an 18–to–20–year–old's right to keep and bear arms.[99]

The court then examined the historical traditions of the nineteenth century, finding "[a]rms-control legislation intensified" during this period, and that by the end of that century, "nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms."[100] It further noted that courts and commentators of this era found such laws "comported with the Second Amendment guarantee."[101]

Like Plaintiffs in this matter, the plaintiffs in *NRA* argued that the right to purchase firearms from FFLs must vest at age 18 because, at the time of the founding, 18 to 20-year-olds were required to serve in the militia, and militia duty necessarily implies the right to purchase firearms.[102] In addressing this argument, the panel, citing *Heller*, reiterated that "the right to arms is not co-extensive with the duty to serve in the militia."[103] It then found that "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21,

---

[98] *Id.* at 201 (alteration in original) (quoting Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359–60 (2009)); *see also Range* at 273 & nn. 15, 16.

[99] *Id.* at 201–02.

[100] *Id.* at 202 (internal citation omitted).

[101] *Id.* at 203 (citing Thomas M. Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883); *State v. Callicutt*, 69 Tenn. 714 (1878); *Coleman v. State*, 32 Ala. 581, 582-83 (1858)); *see also Range* at 279–81.

[102] ECF No. 50 at 20; *NRA*, 700 F.3d at 204 n.17.

[103] *NRA* at n.17 (citing *Heller*, 554 U.S. at 589-94).

depending on legislative need."[104] It further noted that "the 1792 Militia Act gave States discretion to impose age qualification on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21."[105] Based upon this historical fluctuation, the panel rejected plaintiffs' "militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later."[106]

After conducting its survey of historical traditions at step one, the court concluded:

> We have summarized considerable evidence that burdening the conduct at issue—the ability of 18–to–20–year–olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition which suggests that the conduct at issue falls outside the Second Amendment's protection. At a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety. More specifically, the present ban appears consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms. In conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime. . . .
>
> . . . .
>
> To be sure, we are unable to divine the Founders' specific views on whether 18–to–20–year–olds had a stronger claim than 17–year–olds to the Second Amendment guarantee. The Founders may not even have shared a collective view on such a subtle and fine-grained distinction. The important point is that there is considerable historical evidence of age- and safety-based restrictions on the ability to access arms. Modern restrictions on the ability of persons under 21 to purchase handguns . . . seem, to us, to be firmly historically rooted.
>
> Nonetheless, we face institutional challenges in conducting a definitive review of the relevant historical record. Although we are inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution, we proceed to step two.[107]

---

[104] *Id.* The Court acknowledges the dissent in *NRA II* takes issue with this particular statement and contends that "both of the examples offered for this proposition [by the majority] are wrong." *NRA II*, 714 F.3d at 341.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 203–04 (internal citations omitted).

At step two (which, as previously noted, was abrogated by *Bruen*), the Court remained convinced that the challenged laws are constitutional under the Second Amendment.[108]

The dissent in *NRA II* forcefully argues that the challenged laws do not comport with the Second Amendment. The dissent asserts that the panel erred "in rummaging through random 'gun safety regulations' of the 18th century and holding that these justify virtually any limit on gun ownership."[109] In the dissent's view, when "properly relevant historical materials" are consulted, it is indisputable that "the right to keep and bear arms belonged to citizens 18 to 20 years old at the critical period of our nation's history."[110] According to the dissent, in the colonial era, the obligation to serve in the militia and the duty to possess arms generally began at the age of sixteen.[111] "At the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen."[112] The 1792 Militia Act required 18-year-olds "to be available for service, and militia members were required to furnish their own weapons."[113] In the dissent's view, because "minors were in the militia *and*, *as such*, they were required to own their own weapons," any argument that 18 to 20-year-olds were not considered "to have full rights regarding firearms" is inconceivable.[114]

Like the panel in *NRA*, the Court has been "unable to divine" whether the Founders "shared a collective view" as to the full scope of the Second Amendment guarantee, and more particularly, whether their collective view was that persons between the ages of 18 and 20 enjoyed the full scope of its protection. Therefore, the Court has relied primarily upon the parties' pleadings and

---

[108] *Id.* at 204, 211.
[109] *NRA II* at 339 (quoting *NRA* at 200).
[110] *Id.*
[111] *Id.* at 340.
[112] *Id.*
[113] *Id.* at 339.
[114] *Id.* at 342.

briefs in addressing the historical prong of its *Bruen* analysis. As noted, the parties' presentations here essentially involve advocating for the adoption of either the panel opinion in *NRA*, or the dissenting opinion in *NRA II*. Both the panel in *NRA* and the dissent in *NRA II* examined the issue from a historical perspective. The diverging conclusions reached by the opposing camps largely depends upon the level of generality employed. The panel in *NRA* emphasized that "gun safety regulation" was commonplace from colonial times through the nineteenth century; the dissent in *NRA II* focused closely on the minimum age for militia service in the founding era.

While the panel opinion in *NRA* issued pre-*Bruen* and therefore did not employ *Bruen's* exact approach, the Court finds that the panel's discussion of the historical record in *NRA* satisfies the *Bruen* test, as *Bruen* instructs that there need only be "a well-established and representative historical analogue, not a historical twin."[115] The panel cited historical evidence that the Founders likely would not have been of the opinion that minors enjoy the full scope of rights encompassed in the Second Amendment; they cited historical evidence that the Founders believed the Second Amendment did not curtail legislators' ability to disarm or restrict access to firearms by particular groups thought to be without "civic virtue"; and they cited historical evidence that safety-based restrictions were not thought to violate the Second Amendment.[116] The panel confirmed its initial conclusions by looking to nineteenth century laws restricting access to firearms by those under the

---

[115] *Bruen* at 2133.

[116] Such findings comport not only with the classical republican notion of "civic virtue," but also with the patriarchal model of the family that dominated from colonial times through the end of the nineteenth century, in which children were viewed as the property of the patriarch subject to his absolute authority, and not as persons with full agency. *See e.g.* Barbara Bennett Woodhouse, "*Who Owns the Child?": Meyer and Pierce and the Child as Property*, 33 Wm. & Mary L. Rev. 995, 1037-40 (1992); Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1 (2021); Barbara Bennett Woodhouse, *The Constitutionalization of Children's Rights: Incorporating Emerging Human Rights into Constitutional Doctrine*, 2 U. Pa. J. Const. L. 1, 20 (1999); Thomas R. Young, *Historical perspective on children's legal rights*, 1 Leg. Rts. Child. Rev. 3D § 1:2 (3d ed.); *c.f. Morse v. Frederick*, 551 U.S. 393, 418-19 (2007) (Thomas, J. dissenting) ("As originally understood, the Constitution does not afford students a right to free speech in public schools.").

age of 21. The "why" of these historical restrictions was that governing authorities deemed these categories of persons as dangerous to public safety; the "how" was by prohibiting their access to dangerous weapons. Likewise, with regard to the laws challenged in this suit, Congress has deemed unfettered access to handguns by 18 to 20-year-olds to be a danger to public safety, and it has therefore restricted the ability of such persons to independently purchase handguns from FFLs. Essentially then, for these reasons set forth by the Fifth Circuit in *NRA*, the Court holds that the Second Amendment does not protect the ability of 18 to 20-year-olds to purchase handguns from federal firearms licensees, and therefore the Court dismisses Count I.

## B.      Remaining Claims

In the alternative, Plaintiffs seek a declaratory judgment that the challenged laws are unconstitutional as applied to 18 to 20-year-old women (Count II), solely arguing that the challenged restrictions do not meet means-end scrutiny as applied to this sub-class. As discussed, step two of the former appellate test (*i.e.*, means-end scrutiny) was abrogated by *Bruen*. Rather, the standard announced in *Bruen* for evaluating whether a firearm restriction violates the Second Amendment applies to Plaintiffs' as-applied challenge—if the Second Amendment's plain text protects the ability of 18 to 20-year-old females to directly purchase handguns from FFLs, then the government must show the restriction is consistent with the Nation's historical tradition of firearm regulation.[117] For the reasons already discussed, the Court finds that to the extent the Second Amendment protects the challenged conduct, the government, by relying on the panel decision in *NRA*, has adequately demonstrated that the challenged laws are consistent with the Nation's historical tradition of firearm regulation. Accordingly, the Court dismisses Count II.

---

[117]  *Bruen* at 2126; *Bucklew v. Precythe*, 139 S.Ct. 1112, 1127–28 (2019) (the same substantive constitutional analysis applies to facial and as-applied challenges).

Finally, to the extent Plaintiffs seek "nominal damages for constitutional injuries caused by Defendants Lombardo's and Garland's enforcement of the Handgun Ban," Plaintiffs have waived that claim. Plaintiffs do not address the merits of that claim in the underlying briefing, and in a footnote, they state that they "do not contest dismissal" of their "individual-capacity claims against Defendants for nominal damages."[118] Accordingly, Plaintiffs' claim for nominal damages is dismissed.

## V.
### CONCLUSION

For the reasons set forth in this Ruling, "Defendants' Motion to Dismiss Plaintiffs' Amended Complaint or for Summary Judgment" is GRANTED IN PART and DENIED IN PART.[119] Specifically, the motion is DENIED to the extent Defendants seek dismissal pursuant to Rule 12(b)(1) for lack of jurisdiction; the motion is GRANTED to the extent Defendants seek dismissal pursuant to Rule 12(b)(6) for failure to state a claim. The Motion for Partial Summary Judgment filed by Plaintiffs is DENIED.[120]

THUS DONE in Chambers on this 21st day of December, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[118] ECF No. 50 at 10 n.1.
[119] ECF No. 32.
[120] ECF No. 49.